**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                    :

*12/11/06*

**FRANCIS SCOTT HUNT and SUNDRA**
**CHERI HUNT, individually and as Trustee**    :
**for IAN CHRISTOPHER HUNT,**              **OPINION AND ORDER**
**LAWRENCE A. MCMAHON**           :
**and JUDITH J. MCMAHON, PAUL D.**
**CAVANAGH individually and as Trustee**   :
**for the PAUL D. CAVANAGH TRUST,**      **06 Civ. 170 (SAS)**
**VIRGINIA POPE and KEN ROBERTS,**   :

            **Plaintiffs,**         :

        **- against -**          :

**ENZO BIOCHEM, INC., HEIMAN GROSS,** :
**BARRY WEINER, ELAZAR RABBANI,**
**SHARIM RABBANI, JOHN DELUCCA,**    :
**DEAN ENGELHART and JOHN DOES 1-50,**

                    :

           **Defendants.**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

A group of investors bring this action for common law fraud in

connection with the purchase and holding of Enzo Biochem, Inc. ("Enzo")

securities, against the corporation, certain of its officers and directors

(collectively, the "Enzo defendants") and one outside consultant.  Enzo has been a

public company since 1970, engaged in the research and development of

treatments to fight the human immunodeficiency virus ("HIV") and other diseases.[1] The gravamen of the consolidated complaints is that defendants conspired to fraudulently inflate the price of Enzo stock through a series of misrepresentations and omissions about the speed of development and effectiveness of Enzo's medical treatments in order to sell their shares in the company at artificially inflated prices. Plaintiffs allege that they suffered financial losses by relying on defendants' misstatements and omissions when deciding to purchase and hold an unspecified amount of Enzo stock and options. This Court has diversity jurisdiction over this matter pursuant to section 1332 of Title 28 of the United States Code. Venue is proper in this district pursuant to section 1391(a) of Title 28 of the United States Code.

Defendants now move to dismiss this suit on the ground that it is time barred, or, in the alternative, that it fails to satisfy Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. Defendants argue that plaintiffs have failed to plead fraud with the requisite particularity and have failed to plead loss causation,

---

[1]     *See* Hunt Complaint ("Hunt Compl.") ¶ 1. On March 31, 2006, I consolidated two actions, *Hunt v. Enzo Biochem, Inc.*, 06 Civ. 170 and *Roberts v. Hunt Biochem, Inc.*, 06 Civ. 213. These actions were filed on January 10 (Hunt) and January 11, 2006 (Roberts). While a consolidated complaint has not been filed, the Hunt and Roberts Complaints are almost identical except as noted below. I cite only to the Hunt Complaint when there are no differences between the two.

2

reliance and the purchase or sale of a security. For the following reasons,

defendants' motion to dismiss is granted with leave to replead as to all plaintiffs,

except those whose claims are time-barred.

## II.    BACKGROUND[2]

### A.    Overview of the Conspiracy

Beginning in 1998, defendants entered into a "pump and dump"

scheme in which insiders first fraudulently inflated the price of Enzo stock

through a series of misrepresentations and omissions and then sold their stock at

artificially inflated prices. The false disclosures and omissions related to: (1)

Enzo's patent estate; (2) the progress of its HIV pre-clinical and clinical trials; (3)

the efficacy of its gene therapy; and (4) the timing of a major transaction with a

pharmaceutical company.[3] The misrepresentations were made at an annual

shareholders meeting in January 2000, in press releases and in news articles, and

according to the Hunt but not the Roberts Complaint, through dissemination of

insider information to stockbrokers, analysts and shareholders.

By April 1999, defendants were concealing that Enzo's Phase I trial

---

[2]     Except where otherwise noted, the following allegations are drawn from the complaints and are presumed to be true for the purposes of this motion.

[3]     *See* Hunt Compl. ¶ 7.

3

of its HIV therapy was not going well.[4]  In the first quarter of 2000, defendants

fraudulently represented that the Phase I trials were successful so as to permit the

Phase II trials to begin and to allow Enzo to open clinics to treat HIV positive and

acquired immunodeficiency syndrome ("AIDS") patients in April 2000.[5]  These

misrepresentations artificially inflated Enzo's stock, causing some of the

individual defendants to sell large amounts of stock in March of 2000.  Soon

thereafter, Enzo's stock price collapsed, at which point defendants began to again

engage in misrepresentation and omission to boost the stock price.

　　　　By the end of the first quarter of 2001, Enzo's stock price had

returned to the price level it had traded at over the prior two decades.  The fall in

price occurred because the market discovered defendants' exaggerations and

omissions when Enzo's promises of medical and commercial success failed to

materialize.  The company had also disclosed data in March of 2001 indicating

that the treatments whose efficacy defendants had touted had no therapeutic

power.  Plaintiffs do not specify the dates and amounts of Enzo securities (stocks

and options) they purchased and held, but simply state that they each bought and

---

[4]      *See id.* ¶ 5.

[5]      *See id.* ¶¶ 7-9.

4

held Enzo securities from 1998 to 2003 collectively.[6]  Plaintiffs made "all" of their decisions to purchase and hold Enzo securities in reliance on the defendants' "representations" as described in the complaints.[7]

### B.    Misrepresentations to Brokers

As part of defendants' scheme to artificially boost the price of Enzo stock, at unspecified dates in 1999, defendants Barry Weiner and Heiman Gross disseminated non-public information concerning Enzo's prospects to various brokers, including George Somkin, Bob Berlin, Phil Sloan, and Doug Yates, with the intent that they pass on such information to their clients thereby generating demand for the company's stock.[8]  Yates relayed such information to broker Ed Stephen, who was in "constant communication" with plaintiffs Hunt, McMahon and Cavanagh, telling them that he had received inside information – most of which was ultimately false – from defendants Gross, Weiner, Elazar and Shahram[9] Rabbani ("Rabbanis") or Dean Engelhardt concerning "major material events" that

---

[6]    *See id*. ¶¶ 101-120.  *See* Roberts Compl. ¶¶ 89-92.

[7]    Hunt Compl. ¶¶ 101-120, Roberts Compl. ¶¶ 89-92.

[8]    *See* Hunt Compl. ¶¶ 31-35, 77-79.  The Roberts Complaint does not make similar allegations that defendants leaked insider information to brokers or shareholders.

[9]    Plaintiffs mention a "Sharim" Rabbani (*see, e.g.*, case caption and Hunt Compl. ¶ 18) while defendants spell the name as "Shahram."

were likely to result in a rise in Enzo's stock price if and when they occurred.[10] As part of the conspiracy to disseminate false information to pump the stock price, Keating, a paid consultant to Enzo, told plaintiffs that when Enzo announced its successful treatment for AIDS, its stock would trade at over $5,000 a share.[11]

Defendants did not limit their dissemination of insider information to brokers. For example, in 1999, Gross told Robert Jernigan, an investment advisor, that a major diagnostic deal with a European company was expected to occur shortly.[12] Gross also made numerous misstatements to Jernigan as to the great successes of Enzo's gene therapy, HIV treatment, and Phase I trials.[13] Defendants provided false revenue estimates to an analyst from Brenner Securities who relied upon such bogus financials to project that Enzo stock would hit $111 per share sometime in mid-2000.[14]

## C.    The January 2000 Shareholders' Meeting

Numerous misrepresentations were made at the annual shareholders'

---

[10]    Hunt Compl. ¶ 34.

[11]    *See id.* ¶ 35. The Hunt Complaint does not specify Keating's first name.

[12]    *See id.* ¶ 33.

[13]    *See id.*

[14]    *See id.* ¶ 81.

meeting in January 2000 that were largely responsible for the rise in Enzo stock from $44 to $133 within two weeks of the meeting.[15]  At that meeting, Weiner and Engelhardt, Enzo's president and executive vice president, respectively, made several deliberate misstatements concerning Enzo's progress in developing a new HIV treatment and gene therapy.  Engelhardt's misrepresentations were:  (1) "It's all over, but the shouting," commenting on the progress of the Phase I trial;[16] (2) "it works, they both work" in reference to Enzo's gene therapy treatments for HIV and Hepatitis B;[17] and (3) that Enzo's treatment kills the AIDS virus.[18]  In fact, the Phase I trial was "woefully behind" schedule.[19]  It was not successful because there was no increase in patients' T-cell counts or decrease in the viral load which are the "standard [Food and Drug Administration's ("FDA")] markers of efficacy" for this type of treatment.[20]

At the same shareholders' meeting, Weiner made the following

---

[15]     *See id.* ¶ 37.

[16]     *Id.* ¶ 28.

[17]     *Id.* ¶ 40.

[18]     *See id.* ¶ 41.

[19]     *Id.* ¶ 52.

[20]     *Id.* ¶¶ 28, 40.

misrepresentations: (1) that Enzo's Phase I clinical trial was proceeding

satisfactorily and on schedule;[21]  (2) that Enzo would open three clinics to treat

HIV and AIDS patients by the end of 2000 and that Enzo could treat 9,500

patients per clinic at a charge of $30,000 per patient but failed to disclose that

Enzo needed to have FDA approval – which Enzo had not even sought;[22] (3) that

Enzo had submitted Phase I data to the FDA and was awaiting approval of Phase

II even though it had no such data as it had only treated one patient and the results

were not positive;[23] (4) that HGTV-43, a component of Enzo's new gene therapy,

which delivered genes to certain cells to enhance immune responses in a process

called transduction, had reduced successful transduction from a period of up to

three months to eighteen  hours;[24] (5) that Enzo had made a technical breakthrough

because HGTV-43 achieved levels of stable transduction to patients' non-growing

blood stem cells greater than thirty percent;[25] and (6) that the HGTV vector was

---

[21]     *See id.* ¶ 39.

[22]     *See id.* ¶ 42.

[23]     *See id.* ¶ 43.

[24]     *See id.* ¶ 44.

[25]     *See id.* ¶ 46.

8

ready for commercialization.[26]  Weiner failed to mention that the absence of any

positive test results had caused Enzo to modify its transduction process, that the

new eighteen hour transduction process had negative results, and that this had

delayed the development of Enzo's clinical trials.[27]

Defendants repeated some of the same misrepresentations concerning

the efficacy of the Enzo therapies to the press.  In a January 20, 2000 Business

Week article, Weiner was quoted as saying that the clinical trials have produced

"[i]mpressive positive results."[28]  A February 16, 2000 Dow Jones News Service

article quoted Weiner as stating, "[w]e can stop the virus cold" and quoted

Engelhardt as saying that Enzo's treatment "makes the virus disappear."[29]

**D.     Defendants Sell Their Shares in Enzo**

Within a few months after the January shareholder meeting, Enzo

officers and directors sold large amounts of stock.  John DeLucca sold all the Enzo

shares that he owned for approximately two million dollars.[30]  Weiner and the

---

[26]     *See id.* ¶ 47.

[27]     *See id.* ¶ 45.

[28]     *Id.* ¶ 29.

[29]     *Id.*

[30]     *See id.* ¶¶ 10, 61.

Rabbanis collectively transferred or sold 600,000 shares of Enzo stock on March 28, 2000, which had a market value of over forty-eight million dollars.[31] Engelhardt sold approximately $350,000 of shares in March of 2000.[32]

Within two weeks of the March 28 sales, the value of Enzo stock dropped from $81 to $35 per share.[33]  Enzo's failure to announce that it had achieved a cure for AIDS at a conference in early 2000, or to make good on its prior representations that it would begin Phase II trials and open new clinics by April 2000 "undoubtedly cast doubt in the market" as to the truth of the statements made at the January 2000 shareholder meeting.[34]  While sophisticated investors began to realize that Enzo had overstated the efficacy of its cures, plaintiffs were not aware that defendants had intentionally perpetrated a classic pump and dump scheme.[35]

## E.    Defendants' Second Pump

After the price of Enzo stock fell to $35, defendants once again

---

[31]    *See id.* ¶ 63.

[32]    *See id.* ¶ 62.

[33]    *See id.* ¶ 64.

[34]    *Id.* ¶ 65.

[35]    *See id.*

attempted to artificially pump the price back up through a series of

misrepresentations.  Enzo issued a press release, dated April 13, 2000, claiming

that overall the company was in good shape, well-positioned in the market and that

its clinical trials were producing promising results.[36]  The press release stated that

the drop in Enzo's stock price could not be explained as an accurate reflection of

any infirmity on Enzo's part but was merely a mirroring of the general loss in

value that befell the entire biotech industry at the time.[37]  Defendants knew these

statements were false because the clinical trials were not going well, nor were they

on schedule, and the HIV trials were producing unfavorable results.[38]  The April

13 press release also claimed that Enzo had two hundred patents worldwide, when

in reality Enzo only had thirty-six patents, the remainder being the same patents

issued in other countries.[39]

Once again, Weiner and Gross provided brokers with deliberately

misleading information about Enzo that defendants knew would be disseminated

---

[36]     *See id.* ¶¶ 67-74; *see also* 4/13/00 Enzo Biochem Press Release "Enzo Biochem Says Outlook Remains Highly Favorable for Company's Growth," Ex. F to Declaration of Donald H. Chase ("Chase Decl."), counsel to the Enzo defendants.

[37]     *See* Hunt Compl. ¶ 67.

[38]     *See id.* ¶¶ 71-73.

[39]     *See id.* ¶ 75.

11

to the brokers' clients – some of whom were contacted directly.[40]  These

misrepresentations included: (1) an announcement that Enzo had found a cure for

liver cancer; (2) a "blockbuster news" announcement at an AIDS conference in

June 2000; (3) a "major announcement" about its HIV therapy; (4) a planned

secondary offering in the summer of 2000 with an offering price of $250 per

share; (5) announcing a large joint venture with Hoffman LaRoche; and (6) that a

Texas billionaire would underwrite the entire cost of human testing in return for

Enzo's treatment of his daughter who suffered from AIDS.[41]

A press release dated October 2, 2000 stated that the "new data on the

first individual treated in the Phase I clinical trial of HGTV-43, the company's

HIV-1 gene medicine product, show that after nine-and-one-half-months Enzo

engineered cells have successfully engrafted in the patient's bone marrow and

were spawning new differentiated CD4+ cells designed to fight the virus."[42]

However, the engraftment had actually failed and Enzo's treatment had not met

any of the recognized clinical markers of an effective HIV treatment – namely

---

[40]     *See id.* ¶ 77.

[41]     *Id.* ¶¶ 77-79.

[42]     *Id.* ¶ 84. *See also* 10/2/00 Enzo Biochem Press Release "Enzo
Biochem Reports New Data on Phase I HIV Test Shows Engraftment of
Engineered Cells in Bone Marrow," Ex. I to Chase Decl.

increased T-cell count and lower viral loads. The clinical data revealing that the engraftment had actually failed "was exposed to the public" at a meeting of the Recombinant DNA Advisory Committee (the "RAC meeting") of the National Institutes of Health on March 8, 2001.[43] At the RAC meeting, Enzo reported that no clinical patient's T-cell counts had improved and that the viral loads of several patients had increased.[44] Plaintiffs do not allege that the disclosure of this data caused a drop in Enzo's stock price.

### F.   Defendants' Misrepresentations Became Known

In June of 2001, pursuant to the Freedom of Information Act ("FOIA"), plaintiffs received the informed consent forms that Enzo gave to potential participants in its HIV clinical trials.[45] That consent form indicated that those who had high viral loads or low T-cell counts were excluded from participating in the study, which revealed the falsity of earlier press releases

---

[43]     Hunt Compl. ¶ 85. *But see* Recombinant DNA Advisory Committee Minutes of Meeting March 8, 2001, Ex. N to Chase Decl. at 3 ("these data support the conclusions that stable engraftment of some of the antisense RNA producing [cells] has occurred"); *see id.* ("The end point of this study are the safety of the procedure and the extent of the engraftment and proliferation of the engineered cell population.").

[44]     *See* Hunt Compl. ¶ 85.

[45]     *See id.* ¶ 91.

13

claiming that Enzo had begun to treat patients with AIDS.[46] More importantly, "Enzo's claims in the press releases that its treatment was effective were contradicted in its admission in the informed consent form that there was no anticipated therapeutic benefit."[47]

Through 2000 and 2001, when Enzo failed to announce that it was in Phase II testing, that it had opened clinics, or that it had found any cures, the price of Enzo stock continued to drift lower "as sophisticated investors recognized that Enzo's claims were either outright false or hyped . . . . By the first quarter of 2001, Enzo stock was trading approximately where it had traded for the past two decades, as the market digested and corrected for the hype."[48]

## G.    The Prior Suit Against Enzo

Michael J. Rovell, one of plaintiffs' attorneys in this action, filed suit on March 6, 2002 against Enzo and several of the individual defendants named here in the United States District Court for the Eastern District of Virginia (the

---

[46]    *See id.*

[47]    *Id.* ¶ 92.

[48]    *Id.* ¶ 94.

14

"*Glaser* action" or "Glaser Complaint").[49]  After the trial court granted defendants'

motion to dismiss the Glaser Complaint in its entirety, the Fourth Circuit affirmed

in part, but found that the Glaser Complaint sufficiently pled that defendants had

made several misrepresentations and remanded for further proceedings.[50]  On

remand, the trial court granted defendants' renewed motion to dismiss: (1) as to

certain individual defendants because they did not make any of the alleged

misrepresentations that the Fourth Circuit found to be actionable; and (2) as to all

defendants because plaintiffs failed to adequately plead loss causation under the

Supreme Court's decision in *Dura Pharmaceuticals v. Broudo* ("*Dura*"),[51] by

failing to allege that Enzo's stock price fell after the truth was disclosed.[52]  The

Fourth Circuit affirmed the dismissal in all respects on September 21, 2006, after

the briefing on this motion to dismiss was completed.[53]

------

[49]     *See* 11/1/02 Amended Complaint in *Glaser v. Enzo Biochem, Inc.*,
No. Ca-02-1242-A, Ex. A to Declaration of Michael J. Rovell ("Rovell Decl.").
The Glaser Complaint is nearly identical to the Complaint now before this Court.

[50]     *See Glaser v. Enzo Biochem, Inc.*, No. 03-2188, 2005 WL 647745
(4th Cir. Mar. 21, 2005).

[51]     544 U.S. 336 (2005).

[52]     *See* Memorandum Opinion in *Glaser v. Enzo Biochem, Inc.*, (E.D. Va.
July 14, 2005), Ex. A to Chase Decl.

[53]     *See Glaser v. Enzo Biochem, Inc.*, 464 F.3d 474 (4th Cir. 2006).

## III.   LEGAL STANDARD

### A.   Motion to Dismiss

A motion to dismiss pursuant to Rule 12(b)(6) should be granted only if "'it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief.'"[54]  When deciding a motion to dismiss, courts must accept all factual allegations in the complaint as true, and draw all reasonable inferences in plaintiff's favor.[55]  "While the pleading standard is a liberal one, bald assertions and conclusions of law will not suffice."[56]  Even though the plaintiff's allegations are taken as true, the claim may still fail as a matter of law if it appears beyond doubt that the plaintiff can prove no set of facts in support of its claim which would entitle it to relief, or if the claim is not legally feasible.[57]  While consideration of a motion to dismiss under Rule 12(b)(6) is generally limited to consideration of the complaint itself, consideration of

---

[54]    *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

[55]    *See Kirsch v. Liberty Media Corp.*, 449 F.3d 388, 392 (2d Cir. 2006) (citation omitted).

[56]    *Law Offices of Curtis V. Trinko, L.L.P., v. Bell Atl. Corp.*, 309 F.3d 71, 74 (2d Cir. 2002) (quotation omitted).

[57]    *See Allaire Corp. v. Okumus*, 433 F.3d 248, 250 (2d Cir. 2006).

16

materials outside the complaint "is not entirely foreclosed."[58]  It is permissible for

the court to consider materials outside the record that were relied upon in drafting

the complaint or that are integral to a complaint only if the court has determined

that there are no disputes as to the authenticity, accuracy and relevance of such

materials.[59]

## B.    Statute of Limitations

"Where jurisdiction rests upon diversity of citizenship, a federal court

sitting in New York must apply New York choice-of-law rules and statutes of

limitations."[60]  Under New York's borrowing statute, where a non-resident

plaintiff sues based upon a cause of action that accrued outside New York, the

court must apply the shorter limitations period of either New York or the state

where the cause of action accrued.[61]  The borrowing statute requires a court to

apply the limitation period of the foreign jurisdiction even if "jurisdiction is

---

[58]      *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).

[59]      *See id*.

[60]      *Stuart v. American Cyanamid Co.,* 158 F.3d 622, 627 (2d Cir. 1998)
(citing *Guaranty Trust Co. v. York,* 326 U.S. 99, 108-09 (1945); *Klaxon Co. v.
Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496 (1941)).

[61]      *See* New York Civil Practice Law and Rules ("C.P.L.R.") § 202
(McKinney 2006).

17

unobtainable over a defendant in the foreign jurisdiction."[62] New York courts interpreting the borrowing statute hold that the cause of action accrues in the place of the injury, and where the "'injury is purely economic, the place of injury is usually where the plaintiff resides and sustains the economic impact of the loss.'"[63]

In borrowing a foreign statute of limitations, a court must apply all extensions and tolls that are applicable in that state. When a defendant attempts to use the statute of limitations as an affirmative defense, the defendant "bears the burden of establishing by prima facie proof that the limitations period has expired since the plaintiff's claims accrued."[64] If defendant meets this burden, then the plaintiff has the burden to show that the limitations period should be tolled.[65] A motion to dismiss on the basis that a claim is time-barred "may only be granted when the allegations of the complaint make clear that the claim is barred by the

---

[62]    *Insurance Co. of North Am. v. ABB Power Generation, Inc.*, 91 N.Y.2d 180, 180 (1997).

[63]    *Cantor Fitzgerald Inc. v. Lutnick,* 313 F.3d 704, 710 (2d Cir. 2002) (quoting *Global Fin. Corp. v. Triarc Corp.*, 93 N.Y.2d 525, 529 (1999)).

[64]    *Overall v. Estate of Klotz*, 52 F.3d 398, 403 (2d Cir. 1995) (citing *Hoosac Valley Farmers Exch., Inc. v. AG Assets, Inc.*, 563 N.Y.S.2d 954, 955 (3d Dep't 1990)).

[65]    *See id.* (citing *Waters v. Saratoga Springs, Inc. v. State*, 498 N.Y.S.2d 196, 199 (3d Dep't 1986)).

limitations period."[66]

## C.    Common Law Fraud

To recover damages for fraud under New York law, a plaintiff must

prove: (1) a misrepresentation or omission of material fact; (2) which the

defendant knew to be false; (3) which the defendant made with the intention of

inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) which

caused injury to the plaintiff.[67]  "The claim also requires a showing of proximate

causation, such that the injury 'is the natural and probable consequence of the

defrauder's misrepresentation or . . . the defrauder ought reasonably to have

foreseen that the injury was a probable consequence of his fraud.'"[68]

A claim for common law fraud under New York law must also satisfy

the requirements of Federal Rule of Civil Procedure 9(b), including allegations

that give rise to a strong inference of fraudulent intent.[69]  Furthermore, in order to

---

[66]     *Dutton v. Glass*, No. 04 Civ. 3496, 2005 WL 146503, at *1 (S.D.N.Y. Jan. 20, 2005) (internal quotation and citation omitted).

[67]     *See Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001).

[68]     *Suez Equity Investors, L.P. v. Toronto-Dominion Bank,* 250 F.3d 87, 104-05 (2d Cir. 2001) (quoting *Cumberland Oil Corp. v. Thropp*, 791 F.2d 1037, 1044 (2d Cir. 1986)).

[69]     *See, e.g., Olsen v. Pratt & Whitney Aircraft, Div. of United Tech. Corp.*, 136 F.3d 273, 275-76 (2d Cir. 1998).  *Accord Catton v. Defense Tech. Sys., Inc.*, No. 05 Civ. 6954, 2006 WL 27470, at *6 (S.D.N.Y. Jan. 3, 2006).

plead a conspiracy to defraud consistent with the particularity requirements of Rule 9(b), "[w]here multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud."[70]  In other words, "a complaint may not simply clump defendants together in vague allegations."[71]

## IV.  DISCUSSION

### A.  This Action Is Not Time-Barred

The parties agree that under New York's borrowing statute the applicable statute of limitations for a common law fraud claim is determined by the plaintiffs' state of residence.[72]  The parties disagree, however, on two key issues – whether the limitations period has run, and assuming it has, whether the limitations period has been tolled.

---

[70]  *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987).

[71]  *Filler v. Hanvit Bank*, Nos. 01 Civ. 9510, 02 Civ. 8251, 2003 WL 22110773, at *2 (S.D.N.Y. Sept. 12, 2003).  *Accord Aetna Cas. and Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 579-80 (2d Cir. 2005) ("Sweeping references to the collective fraudulent actions of multiple defendants will not satisfy the particularity requirements of 9(b).") (quotation and citation omitted).

[72]  *See* Enzo Defendants' Memorandum of Law in Support of the Enzo Defendants' Motion to Dismiss ("Def. Mem.") at 8-10; Plaintiffs' Reply Memorandum in Opposition to Defendants' Motions to Dismiss ("Pl. Mem.") at 29-30.

20

## 1.    The Limitations Period Has Run

Under the applicable statute of limitations in their home states, all plaintiffs must have commenced a common law fraud action within either three or four years from the date on which the fraud was discovered or could have been discovered through reasonable diligence.[73] Specifically: (1) the Hunt plaintiffs are residents of Georgia which has a four-year statute of limitations;[74] (2) the McMahon plaintiffs are residents of South Carolina which has a three-year limitations period;[75] (3) the Cavanagh plaintiffs are residents of Massachusetts which has a three-year limitations period;[76] (4) Pope is a resident of Florida which

---

[73]    *See* Def. Mem. at 11-13; Pl. Mem. at 33-39.

[74]    *See* Hunt Compl. ¶ 11; Ga. Code Ann. § 9-31-31; *Nash v. Ohio Nat'l Life Ins. Co.*, 266 Ga. App. 416, 418 (2004) (stating that the statute runs from when "such fraud is discovered, or could have been discovered by the exercise of ordinary care and diligence") (internal quotation and citation omitted).

[75]    *See* Hunt Compl. ¶ 13; S.C. Code Ann. § 15-3-530; *Dean v. Ruscon Corp.*, 321 S.C. 360, 363 (1996) (according to discovery rule, the "statute runs from the date the injured party either knows or should have known by the exercise of reasonable diligence that a cause of action arises from the wrongful conduct").

[76]    Although the Hunt Complaint (¶ 11) states that the Cavanagh plaintiffs are residents of New Jersey, the parties now agree that they are residents of Massachusetts.  *See* Def. Mem. at 8 n.5; Pl. Mem. at 36; *see also* Mass. Gen. Laws ch. 260, § 2A; *Albrecht v. Clifford*, 436 Mass. 706, 714 (2002) (under discovery rule, limitations period begins to run when "a prospective plaintiff learns or should have learned that he has been injured").

21

has a four-year limitations period;[77] and (5) Roberts is a resident of California
which has a three-year limitations period.[78]

Defendants claim that plaintiffs filed these actions just days before
the sixth anniversary of the January 14, 2000 shareholders' meeting when many of
the alleged misrepresentations were made, in a blatant attempt at forum shopping
to take advantage of New York's six-year limitations period for fraud claims.[79]
Defendants assert that plaintiffs should have learned of their fraud claims no later
than March 8, 2001, at the RAC meeting when data was "exposed to the public"

---

[77]     *See* Hunt Compl. ¶ 15; *see also* Fla. Stat. Ann. § 95.11(3)(j)(2006)
(four-year statute of limitations for fraud), *and* Fla. Stat. Ann. §
95.031(3)(a)(2003) (limitations period runs "from the time the facts giving rise to
the cause of action were discovered or should have been discovered with the
exercise of due diligence").

[78]     *See* Roberts Compl. ¶ 11; Cal. Code Civ. Proc. § 338(d) (2006); *Kline
v. Tucker*, 87 Cal. App. 4th 1369, 1374 (Cal. Ct. App. 2001) (statute of limitations
begins to run "when the plaintiff has notice or information of circumstances to put
a reasonable person on inquiry") (internal quotation and citation omitted).

[79]     *See* Def. Mem. at 1; *see also* C.P.L.R. § 213(8)  (McKinney 2006)
(for an action based upon fraud "the time within which the action must be
commenced shall be the greater of six years from the date the cause of action
accrued or two years from the time the plaintiff or the person under whom the
plaintiff claims discovered the fraud, or could with reasonable diligence have
discovered it").  The Fourth Circuit found eight alleged misrepresentations to be
actionable, five of which occurred at the January 12, 2000 shareholders' meeting
and three of which were made in a press release dated April 13, 2000. *See Glaser*,
2005 WL 647745, at *6; *see also* 4/13/00 Enzo Biochem Press Release, Ex. G to
Chase Decl.

revealing that Enzo's procedure for engraftment had failed.[80]  Alternatively,

defendants argue that the limitations period began running in June 2001 when

plaintiffs received certain documents pertaining to Enzo, through a FOIA request,

which established defendants' misrepresentations.[81]  Defendants also argue that

plaintiffs' FOIA request pertaining to Enzo's clinical trials shows that plaintiffs

"were well aware of their possible fraud claim" and were actively investigating the

facts which might underlie this claim.[82]  Because the Hunt and Roberts Complaints

were filed four and a half years after receipt of the FOIA information, defendants

argue that the claims of all plaintiffs are time-barred by their resident state's

statute of limitations.

Plaintiffs do not allege when they learned or should have learned

through due diligence that they had potential claims.  Instead, plaintiffs assert that

the date when each plaintiff discovered or should have discovered the facts

---

[80]     *See* Def. Mem. at 10 (citing Hunt Compl. ¶ 85 and Roberts Compl. ¶ 73).  Plaintiffs note that a video of the entire meeting may be downloaded from the National Institutes of Health's website.  *See* Hunt Compl. ¶ 90.

[81]     *See* Reply Memorandum of Law in Further Support of the Enzo Defendants' Motion to Dismiss ("Reply Mem.") at 3.

[82]     *Id*.  Plaintiffs do not provide the date of their FOIA request.

underlying his or her claim cannot be determined at this stage of the litigation.[83]

The allegations in the Complaints reveal that plaintiffs through reasonable

diligence should have discovered that they had a potential claim more than four

years before bringing this action. Plaintiffs cannot explain why they were not on

inquiry notice of a possible claim after receiving documents in June of 2001

pursuant to their FOIA request, which provided hard evidence that defendants had

lied about the efficacy of Enzo's clinical treatments.

The Complaints allege that defendants made a series of

misrepresentations and omissions which began in 1999 and continued through

2000. The last misrepresentation identified in the Complaints is a press release

dated October 2, 2000. Plaintiffs attach a chart of Enzo's stock price from 1992 to

---

[83]    *See* Pl. Mem. at 31-32. ("The issue of when each of the Plaintiffs
discovered or should have discovered the facts underlying his or her claim is a
question of fact and can not be ordained by the Defendants [sic] unilateral
declaration or reference to other litigation filed by one of Plaintiffs' counsel in
another forum."). Defendants cannot simply impute knowledge to plaintiffs here
based on when Rovell learned of the alleged fraud in the *Glaser* action in which he
was the lead lawyer. *See* Def. Mem. at 1-2; Reply Mem. at 3. The strongest
evidence of a connection between the *Glaser* action and the ones here is a
declaration submitted in the *Glaser* action from one of the original plaintiffs in the
*Hunt* action, Paul Lewicki, whose claims have since been dismissed by stipulation
of the parties. *See* 9/8/03 Declaration of Paul Lewicki, Ex. D to Rovell Decl. at 2
(stating that he has known Glaser for three years and that he has "contributed
funds to defray expenses in this litigation").

2002, which shows that after hitting a record peak in the beginning of 2000, and then another notable yet smaller peak in the middle of that year, the stock price dropped in early 2001 to the price at which it had been trading in the beginning of 1999 and for the previous seven years.[84]  Plaintiffs explain that this price decline resulted from the market having "digested and corrected for the hype."[85]  After the stock price leveled off, plaintiffs received the response to their FOIA request in June of 2001.

Plaintiffs make several responses to defendants' argument.  *First*, although they do plead that data was "exposed to the public" indicating that Enzo's procedure had failed, at the RAC meeting on March 8, 2001, they do not allege they were at that meeting or should have any knowledge of what occurred there.[86]  They then argue that even if they were at the meeting, they would not have understood the significance of what occurred given that the discussion was highly technical and laden with scientific jargon incomprehensible to the

---

[84]     *See* Monthly Enzo Stock Price Chart, Ex. 1 to Hunt Compl.

[85]     Hunt Compl. ¶ 94.  Plaintiffs seem to have been aware of the limitations problem in drafting the Complaint, as they attempt to draw a contrast between sophisticated investors (such as Fidelity), who had the capacity to see through defendants' fraudulent misstatements, and their own naive trust and reliance on those statements.

[86]     *See* Pl. Mem. at 30.

layperson.[87] *Second,* they note that defendants deny that the RAC panel found that

there had been a failure of engraftment, suggesting that if defendants are correct

then the truth was not revealed at the RAC meeting and plaintiffs were not on

notice that they had a fraud claim.[88]

Although plaintiffs do not specify when they knew of or suspected

the alleged fraud, they suggest – albeit, not with great clarity – that they realized

the fraud on or about the date on which they commenced this action:

> Significantly, this [RAC] meeting occurred approximately
> 13 months after the [January] shareholder's [sic] meeting
> so that it is not as damning that no progress had been made
> in terms of moving from Phase I to Phase II, then [sic] at
> the time these Complaints were filed, in which almost 60
> months had passed without any progress being made by
> Enzo regarding gene therapy.[89]

This reply misses the mark.  The question is when plaintiffs should have known of

their fraud claim, not whether the length of time between defendants'

misrepresentation and the non-materialization of a promised event made it more

likely that defendants had engaged in fraudulent conduct.  However, it is telling

that plaintiffs exhaustively discuss why the RAC meeting did not place them on

---

[87]    *See id.* at 30-31.

[88]    *See id.* at 32.

[89]    *Id.* at 31.

notice of possible claims but never address why the response to their FOIA request
did not put them on inquiry notice of defendants' fraud.  Assuming plaintiffs'
allegations are true, as I must, plaintiffs should have been on notice of their claims
no later than June of 2001.  Accordingly, all plaintiffs' claims are time-barred
unless they can show that the limitations period has been tolled.[90]

## 2.    The Foreign Tolling Statutes Are Applicable

In an attempt to avoid the time-bar, plaintiffs argue that defendants
have ignored New York's borrowing statute which requires a court to apply the
tolling rules of the foreign state.[91]  Each plaintiff's state of residence – with the
exception of Georgia – has a statute that tolls the limitations period for the time
that defendants are absent from the state.[92]  Plaintiffs argue that the date they
should have discovered their claims is irrelevant because their resident states'
statutes of limitations are tolled based on defendants' absence, resulting in the
application of New York's six-year statute because the borrowing statute requires

---

[90]    Because the Hunts reside in Georgia, which does not have a tolling
provision for non-resident defendants, the claims of the Hunt Plaintiffs are time-
barred.

[91]    *See* Pl. Mem. at 32 (citing to *Lewis v. Rosenfeld*, 138 F. Supp. 2d 466,
474 (S.D.N.Y. 2001)).

[92]    *See* Cal. Code Civ. Proc. § 351 (2006); Fla. Stat. Ann. §
95.051(1)(a)(2003);  Mass. Gen. Laws ch. 260 § 9; S.C. Code Ann. § 15-3-30.

27

a court to apply the shorter limitations period.[93]  Under this theory, because the

complaints were filed less than six years after the earliest alleged

misrepresentations, it does not matter when plaintiffs discovered or should have

discovered the fraud.[94]

Defendants contend that the foreign tolling provisions should not

apply because: (1) they violate the Commerce Clause of the United States

Constitution; and (2) they contradict the purposes behind New York's borrowing

statute.  Alternatively, defendants argue that the tolling provisions cannot apply

because the defendants are amenable to personal jurisdiction in each of plaintiffs'

resident states.[95]

---

[93]    *See* C.P.L.R. § 202.

[94]    *See* C.P.L.R. § 213(8); *Saphir Int'l, SA v. UBS PaineWebber Inc.*, 807
N.Y.S.2d 58, 59 (1st Dep't 2006) ("An action alleging a cause of action for fraud
must be commenced within six years from the time of the fraud or within two
years from the time the fraud was discovered or, with reasonable diligence, could
have been discovered."). *Accord Percoco v. Lesnak*, 806 N.Y.S.2d 674, 675 (2d
Dep't 2005).  Defendants concede that if New York's six-year statute of
limitations applies, then plaintiffs timely brought this action. *See* Def. Mem. at 10
n.7.

[95]    *See, e.g.*, *Walsh v. Ogorzalek*, 372 Mass. 271, 274 (1977)
(Massachusetts' tolling statute applies only to "a person who by reason of
nonresidence is beyond the jurisdiction and process of the court"); Fla. Stat. Ann.
§ 95.051(1)(h) (stating that the tolling provisions "shall not apply if service of
process . . . can be made in a manner sufficient to confer jurisdiction to grant the
relief sought"); *Meyer v. Paschal*, 330 S.C. 175, 184 (1998) ("the tolling statute is

### 3.    The Tolling Statutes Are Not Unconstitutional As Applied

Defendants assert that applying the tolling provisions of plaintiffs'

resident states to non-residents who are engaged in interstate commerce violates

the Commerce Clause.[96]  Defendants rely on a line of cases beginning with the

Supreme Court's decision in *Bendix Autolite Corp. v. Midwesco Enterprises* which

held that when "a [s]tate denies ordinary legal defenses or like privileges to out-of-

state persons or corporations engaged in commerce, the state law will be reviewed

under the Commerce Clause to determine whether the denial is . . . an

impermissible burden on commerce."[97]

*Bendix* found that Ohio's tolling statute was unconstitutional under

the Commerce Clause because the burden imposed on interstate commerce

exceeded any local interest that the state might advance.  In order to avoid tolling,

---

inapplicable when the nonresident defendant is amenable to personal service and
can be brought within the personal jurisdiction of our courts"); *Abramson v.
Brownstein*, 897 F.2d 389 (9th Cir. 1990) (holding that section 351 of the
California Code of Civil  Procedure violates the Commerce Clause as applied to a
non-resident engaged in interstate commerce who is subject to California's long-
arm jurisdiction).  *Accord Filet Menu, Inc. v. Cheng*, 71 Cal. App. 4th 1276 (Cal.
Ct. App. 1999).

[96]    *See* Reply Mem. at 5-6.  Defendants make this argument for the first
time in their Reply Memorandum.  Because this argument fails, plaintiffs have not
suffered any prejudice.

[97]    486 U.S. 888, 893 (1998).

a foreign corporation had to appoint an agent for service of process which would

then subject it to the general jurisdiction of the Ohio courts.[98]  The Court found

that:

> Ohio cannot justify its statute as a means of protecting its
> residents from corporations who become liable for acts
> done within the State but later withdraw from the
> jurisdiction, for it is conceded by all parties that *the Ohio
> long-arm statute would have permitted service on
> [defendant] throughout the period of limitations.*[99]

In *Bendix* and its progeny, the tolling statutes were unconstitutional as applied,

because the absent defendants were subject to jurisdiction in the forum states

throughout the limitations period – generally through the exercise of long-arm

jurisdiction.[100]  Here, by contrast, all of the four states at issue (California, Florida,

---

[98]    *See id.* at 892.

[99]    *Id.* at 894 (emphasis added).

[100]    *See* Reply Mem. at 5-6 (citing *Abramson*, 897 F.2d at 393 ("Like the
defendant in *Bendix,* the California long arm statute would have permitted service
on [defendant] throughout the limitations period.  The California tolling statute is
therefore unconstitutional.");  *Bottineau Farmers Elevator v. Woodward-Clyde
Consultants*, 963 F.2d 1064, 1074 (8th Cir. 1992) ("As in *Bendix*, the state's
interest in assisting its residents in litigating against non-resident defendants,
when long-arm service of process is available, cannot justify imposition of a
greater burden on non-residents than residents.");  *Juzwin v. Asbestos Corp., Ltd.*,
900 F.2d 686, 690 (3d Cir. 1990) (finding New Jersey tolling statute
unconstitutional because it applies to out-of-state defendants who are subject to
long-arm service);  *Guyton v. J. M. Mfg., Inc.*, 894 F. Supp. 252, 255 (D.S.C. 1995)

Massachusetts and South Carolina) prohibit the use of the tolling provision if the absent defendant is subject to personal jurisdiction in the state during the limitations period.  Because this Court has found that defendants were *not* amenable to personal jurisdiction in those states during the limitations period, this case is distinguishable from *Bendix* and the tolling statutes are not unconstitutional as applied.

### 4.    New York Applies Foreign Tolling Statutes Based on Defendants' Absence from Plaintiffs' Resident States

Defendants next argue that it is incongruous to apply the shorter limitations period of a foreign state that lacks jurisdiction over a defendant, but then toll the running of that period precisely for that reason.[101]  The New York Court of Appeals has held that New York's borrowing statute requires application of the limitation period of a foreign jurisdiction if it bars the claim, and that it "matters not that jurisdiction is unobtainable over a defendant in the foreign

---

(finding South Carolina tolling provision unconstitutional as applied "because the South Carolina long-arm statute would have permitted service on Defendants throughout the period of limitations").

[101]    *See* Def. Mem. at 8 n.8 ("the non-resident tolling provisions should not be applied . . . in these circumstances based on the rationale" in *ABB Power*, 91 N.Y.2d 180).

31

jurisdiction."[102]  When borrowing a foreign statute of limitations, New York courts

have long been required to also borrow all tolling provisions that are applicable in

the foreign state, including tolls based on absence from the jurisdiction.[103]

### 5. Defendants Have Not Shown They Are Amenable to Jurisdiction in the Relevant States

Plaintiffs assert that because defendants are not amenable to personal

jurisdiction in plaintiffs' resident states, the tolling statutes apply and the action is

not time-barred.[104]  As I have now determined that the tolling statutes apply, the

---

[102]    *ABB Power*, 91 N.Y.2d at 188.  Specifically, the Court of Appeals
was asked to interpret the following italicized passage of section 202 of the
C.P.L.R.: "An action based upon a *cause of action accruing without the state*
cannot be commenced after the expiration of the time limited by the laws of either
the state or the place without the state where the cause of action accrued, except
that where the cause of action accrued in favor of a resident of the state the time
limited by the laws of the state shall apply."  The Court of Appeals concluded that
the place of accrual simply means the "location of the source from which
plaintiffs' cause of action originated" and does not mean "cause of action accruing
*and subject to suit* without the state."  *Id.* at 186.

[103]    *See Smith Barney, Harris Upham & Co. v. Luckie*, 85 N.Y.2d 193,
207 (1995); *Childs v. Brandon*, 60 N.Y.2d 927 (1983) (finding that action was not
time-barred because Alabama statute tolled the limitations period when defendants
were absent from the state). *See also Gordon & Co. v. Ross*, 63 F. Supp. 2d 405
(S.D.N.Y. 1999) (borrowing Massachusetts statute of limitations and also applying
tolling statute because defendant was not amenable to jurisdiction in
Massachusetts).

[104]    *See* Pl. Mem. at 35 ("Based upon all of the information known to the
Plaintiff's [sic] at all times material to this case all of the Defendants have been
and are beyond the personal jurisdiction and process of the South Carolina

burden shifts to defendants to establish that they are exempt from these statutes.[105]

Defendants first note that they were all defendants in the *Glaser* action "where

personal jurisdiction [in Virginia] was asserted and not challenged," and there is

no reason to conclude that Virginia is any different than the states at issue here.[106]

However, because jurisdiction was never challenged in the *Glaser* action, it

provides no guidance as to whether defendants are amenable to jurisdiction in

plaintiffs' home states.

Defendants next argue that the Complaints establish that they are

amenable to specific jurisdiction in plaintiffs' home states under the "effects" test

adopted by the Supreme Court in *Calder v. Jones*.[107]   Specifically, plaintiffs allege

---

courts"); *id.* at 37 ("There is also no question that for purposes of this case, each of
the Defendants is beyond the personal jurisdiction and process of the
Massachusetts courts."); *id.* at 38 ("Again it is undisputed that at all times material
to Plaintiff Pope's claim, the Defendants have been absent from the State of
Florida and are not subject to the personal jurisdiction and process of the Florida
courts with respect to the subject matter of Plaintiff Pope's claims."); *id.* at 39
("None of the Defendants are residents of California nor is there any suggestion
that any of the Defendants were in California for three years subsequent to when
Plaintiff Roberts' claim accrued . . . . ").

[105]    *See Overall*, 52 F.3d at 403.

[106]    Reply Mem. at 7 n.5.

[107]    465 U.S. 783 (1984).  California, Massachusetts, and South
Carolina's long-arm statutes extend to the limits of due process. *See* Cal. Code
Civ. Proc. § 410.10 ("A court of this state may exercise jurisdiction on any basis
not inconsistent with the Constitution of this state or of the United States."); *Tatro*

that defendants

> engaged in an intentional tortious conspiracy that caused a substantial injury (i.e., had a substantial 'effect') in the various forum states.  As such, if the conspiracy were properly pled with sufficient detail each individual defendant would be subject to service and jurisdiction in those forum states under *Calder*, thus rendering the tolling provisions inapplicable.[108]

But generally speaking, the tortious acts described by the Complaints are

misrepresentations that were aimed at a general nationwide audience through press

releases, statements to the press and at a shareholders' meeting.[109]

---

*v. Manor Care, Inc.*, 416 Mass. 763, 771 (1994) ("[T]he Massachusetts long-arm statute functions as an assertion of jurisdiction over the person to the limits allowed by the Constitution of the United States.") (internal citation and quotation omitted); *Meyer*, 330 S.C. at 181 ("South Carolina enacted its version of the long-arm statute in 1966 and it has been interpreted to extend to the outer limits of the due process clause.").  However, Florida does not interpret its long-arm statute as extending to the full extent of constitutional authority.  *See Gibbons v. Brown*, 716 So. 2d 868, 869 (1998) ("Generally speaking, Florida's long-arm statutes are of a class that requires more activities or contacts to allow service of process than are currently required by the decisions of the United States Supreme Court.").

[108]    Reply Mem. at 8 (citing to *Dole Food Co. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002) (stating that specific jurisdiction may be obtained over a defendant under the *Calder* "effects" test when the defendant has allegedly: (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state)).

[109]    *See* Hunt Compl. ¶ 25, Roberts Compl. ¶ 21 ("All of the purchases set forth herein were made as a result of false and misleading press releases, false and misleading statements made at the annual shareholders' meeting, and false and misleading information disseminated directly or indirectly by Barry Weiner and

34

The Roberts Complaint only describes intentional misrepresentations that were aimed at actual or potential purchasers of Enzo securities. It does not allege any actions that defendants took which are specifically directed to any particular plaintiff. Defendants argue that because Enzo is registered to sell securities in each of plaintiffs' home states, this constitutes purposeful availment of the benefit and legal protection of the laws so as to confer specific jurisdiction over Enzo for the sale of securities in each of those states.[110] But defendants have not cited any authority for the proposition that all publicly traded companies are subject to personal jurisdiction in all fifty states merely by selling their securities nationwide.[111] Thus, defendants are not amenable to the personal jurisdiction in

---

[Heiman] Gross.").

[110]    *See* Reply Mem. at 7 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (stating that a defendant is subject to specific jurisdiction where the defendant has "purposefully availed[ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws").

[111]    *See, e.g., Kisiel v. RAS Sec. Corp.*, No. 3:01-CV-294-X, 2001 WL 912425, at *3 (N.D. Tex. Aug. 9, 2001) (finding that corporation was not subject to specific jurisdiction solely because it was registered to sell securities in forum state in the absence of allegation that defendant engaged in any fraudulent activity in state). *See also 2000 Int'l Ltd. v. Chambers*, No. 99-2123-JTM, 2000 WL 1801835, at *6 (D. Kan. Nov. 6, 2000) (defendant registered to sell securities in Kansas not subject to personal jurisdiction because plaintiff failed to allege that defendant purposefully directed any actions toward residents of forum).

California based solely on the allegations in the Roberts Complaint.

By contrast, the Hunt Complaint alleges that defendants Weiner and Gross spread misinformation to brokers with the knowledge and the intent that these brokers would pass on these misstatements to their clients who would rely on them to buy and hold Enzo securities. Plaintiffs McMahon, Cavanagh and Hunt allege that their broker disseminated misinformation that originated from Weiner and Gross.[112] The Hunt Complaint also alleges that "as part of the conspiracy" defendants paid a consultant who "*told plaintiffs* that when Enzo announced its successful treatment for AIDS" the market price of Enzo securities would soar.[113] If these allegations are true, it is possible that plaintiffs were told such misrepresentations in their home states which might confer jurisdiction over defendants. However, the Hunt Complaint does not allege where these contacts occurred. While these misrepresentations may have misled plaintiffs, based on the information presented to the Court at this time, they do not establish that defendants had sufficient minimum contacts with plaintiffs' resident states to support the exercise of personal jurisdiction. That is, even if the alleged misrepresentations are actionable in New York – where jurisdiction has not been

---

[112]     *See* Hunt Compl. ¶ 34.

[113]     *Id.* ¶ 35 (emphasis added).

36

challenged – there are no allegations that defendants or their agents had *any* direct contacts with plaintiffs' resident states.[114]

Because I conclude that defendants are not amenable to personal jurisdiction in plaintiffs' resident states, the tolling statutes apply and the motion to dismiss this action as time-barred is denied. Defendants may renew this motion at the close of discovery when more evidence might be presented to the Court that would support a finding that defendants were indeed amenable to jurisdiction in plaintiffs' resident states.

## B.    Rule 9(b) – Pleading Fraud with Particularity

### 1.    The Claims Against DeLucca and the Rabbanis Are Dismissed Based on Plaintiffs' Failure to Plead Fraud with Particularity

---

[114]    As noted above, plaintiffs aver that they are unaware of any facts that would allow their home states to obtain personal jurisdiction over defendants. *See* Pl. Mem. at 35-37. But when defendants directly aimed communications about securities purchases to plaintiffs in their resident states, courts have found sufficient minimum contacts. *See, e.g., Witty v. Primus Telecommunications Group*, No. 02-1933, 2006 WL 1995287, at * 5 (D.N.J. July 14, 2006) (finding specific jurisdiction over defendants who made presentations in and sent promotional materials to New Jersey); *Ruo-Fang Lo v. Chang*, No. Civ. A.03-3156, 2004 WL 307472, at * 3 (E.D. La. Feb. 12, 2004) (defendants purposefully directed activities toward forum to establish requisite minimum contacts by soliciting purchases of stock in person and by telephone calls to Louisiana); *Universal Premium Acceptance Corp. v. Oxford Bank & Trust*, 277 F. Supp. 2d 1120, 1127-28 (D. Kan. 2003) (defendant purposefully availed itself of forum by correspondence with plaintiffs in Kansas with respect to purchase of securities).

DeLucca, the Rabbanis, and Gross move to dismiss based on plaintiffs' failure to allege that they made any misleading statements, offering instead only conclusory statements that they participated in a pump and dump scheme.[115]  While plaintiffs concede that they never alleged that DeLucca or the Rabbanis "made a single misleading statement," they note that they did plead that these defendants "conspired with each other" and the other defendants.[116]  The only specific allegations in the Complaints as to any actions by DeLucca or the Rabbanis are that they sold their shares in Enzo.[117]  Plaintiffs' general allegations that these defendants "conspired with each other" and sold their shares are impermissibly vague and therefore all claims against DeLucca and the Rabbanis must be dismissed.

### 2.  The Roberts Complaint Is Dismissed as to Gross for Failure to Plead Fraud with Particularity

The Roberts Complaint mentions Gross in four paragraphs, alleging that he told: (1) shareholders that DeLucca had sold his shares because his pending divorce required him to; and (2) unnamed persons that Weiner and the Rabbanis

---

[115]    *See* Def. Mem. at 24; *see also* Heiman Gross' Memorandum of Law in Support of Motion to Dismiss Complaints at 1-2.

[116]    Pl. Mem. at 24.

[117]    *See* Hunt Compl. ¶¶ 61, 63; Roberts Compl. ¶¶ 52, 54.

transferred their shares to trusts for their children instead of selling them.[118] There is no allegation that Gross knew that these statements were false and no specification as to whom and when they were made. Therefore, the Roberts Complaint fails to plead fraud against Gross with the particularity required by Rule 9(b).

### 3.   Gross' Motion to Dismiss the Hunt Complaint Based on Its Failure to Plead Fraud with Particularity Is Denied

The Hunt Complaint makes more detailed allegations against Gross, describing misrepresentations that he relayed to specific brokers, one of whom was disseminating misinformation directly to plaintiffs.[119] The Hunt Complaint therefore sufficiently alleges the misrepresentations Gross made, to whom they were made, and when they were made. These allegations are sufficient to defeat Gross' motion to dismiss the Hunt Complaint pursuant to Rule 9(b) for failing to plead the alleged misrepresentations.

### C.   The Complaints Must Be Dismissed for Failure to State a Claim

### 1.   Plaintiffs Fail to Properly Plead Loss Causation[120]

---

[118]   *See* Roberts Compl. ¶¶ 16, 21, 52, 54.

[119]   *See* Hunt Compl. ¶¶ 31-34, 77-78.

[120]   The parties do not discuss whether the pleading of loss causation is governed by Rule 8(a) or 9(b). As the Supreme Court left the question open in

Defendants argue that plaintiffs have failed to adequately plead loss causation based on the absence of any allegation that the price of Enzo stock fell after the truth of defendants' misrepresentations was revealed.[121]   Defendants contend that because there was no corrective disclosure before the economic loss occurred, the alleged deception could not have caused plaintiffs' economic loss.[122]

Plaintiffs argue that their theory of loss causation is not simply that they bought Enzo shares at an inflated price and then suffered a loss when the price

---

*Dura* and the Second Circuit has yet to address it, I assume that Rule 8(a) applies. *See Ong v. Sears, Roebuck & Co.*, No. 03 C 4142, 2006 WL 2990438, at \*12 (N.D. Ill. Oct. 18, 2006) ("[C]ourts in this district and elsewhere have interpreted *Dura* as imposing no heightened pleading standard for loss and causation.") (collecting cases); *In re Silicon Image, Inc. Sec. Litig.*, No. C 05 456 MMC, 2006 WL 1709424, at \*3 (N.D. Cal. June 21, 2006) (explaining that "loss causation need not be pleaded with specificity") (internal quotation and citation omitted); *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 439 F. Supp. 2d 692, 714 (S.D. Tex. 2006) ("This Court also interprets [*Dura*] as permitting the pleading of loss causation under the notice standard of Rule 8 rather than applying the heightened requirements of Rule 9(b)."); *In re eSpeed, Inc. Sec. Litig.*, No. 05 Civ. 2091, 2006 WL 880045, at \*17 (S.D.N.Y. Apr. 3, 2006) (same).

[121]   *See* Def. Mem. at 20-21, Reply Mem. at 11 (citing *Dura*, 544 U.S. 336).

[122]   *See Enzo*, 464 F.3d at 479 (finding that plaintiffs inadequately pled the element of loss causation as part of their common law fraud claim because they failed to "link the drop in stock price to any revelation of the true facts behind any alleged misrepresentation by defendants"). *See also In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288, 2005 WL 375314, at \*6 (S.D.N.Y. Feb. 17, 2005) ("A concealed fact cannot cause a decrease in the value of a stock before the concealment is made public.").

40

fell – which is the theory rejected by the Supreme Court in *Dura*.[123]  Rather,

plaintiffs allege that by the end of the first quarter of 2001, the market learned that

defendants had overstated and/or lied about Enzo's prospects.[124]  The market

---

[123]    *See Dura*, 544 U.S. at 342-43 ("For one thing, as a matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that *at that instant* possesses equivalent value.  Moreover, the logical link between the inflated share purchase price and any later economic loss is not invariably strong . . . [I]f, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss.  If the purchaser sells later after the truth makes its way into the marketplace, an initially inflated purchase price *might* mean a later loss.  But that is far from inevitably so.  When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price.").  While *Dura* involved a federal fraud claim, it is also applicable to common law fraud claims because the element of causation is the same in both.  *See Catton*, 2006 WL 27470, at *10 ("Because state law fraud claims require a pleading of proximate causation, the deficiency in plaintiffs' pleading of loss causation likely dooms its remaining state law claim.") (citing *Rich v. Maidstone*, No. 98 Civ. 2569, 2002 WL 31867724, at *13 (S.D.N.Y. Dec. 20, 2002) (deciding that "[b]ecause [the elements of common law fraud] are substantially identical to those governing § 10(b), the identical analysis applies") (internal citation omitted)).

[124]    *See* Hunt Compl. ¶ 94 ("Throughout the calendar year 2000 and 2001 when Enzo failed to announce that it was in Phase II testing that clinics had been opened or make any announcements regarding that it cured either AIDS, HIV, or liver cancer. [sic]  The price of Enzo stock continued to drift lower as sophisticated investors recognized that Enzo's claims were either outright false or hyped . . . .  By the first quarter of 2001, Enzo stock was trading approximately where it had traded for the prior 18 years, as the market digested and corrected for the hype.").

demand for Enzo stock then subsided and its price fell.  Plaintiffs assert that based

on these allegations they have adequately pled that the materialization of an

undisclosed condition caused their loss.[125]

But plaintiffs' only support for the claim that the market learned of

defendants' misstatements is that: (1) Fidelity sold all of its shares by the end of

2000;[126] and (2) an analyst who had previously predicted that Enzo's stock might

reach $111 per share later revised his estimate to $40 per share after learning that

Enzo needed FDA approval before its gene therapy could be commercialized.[127]

Neither of these statements can be viewed as a corrective disclosure, nor is there any

allegation of the materialization of an undisclosed risk.[128]  These two conclusory

---

[125]    *See* Pl. Mem. at 15 ("'Where the alleged misstatement conceals a
condition or event which then occurs and causes the plaintiff's loss, a plaintiff
may plead that it is the materialization of the undisclosed condition or event that
causes the loss.  Alternatively, a plaintiff may identify particular disclosing events
that reveal the false information, and tie dissipation of artificial price inflation to
those events.'") (quoting *Catton*, 2006 WL 27470, at *6) (internal quotations and
citations omitted).

[126]    *See* Hunt Compl. ¶ 94.

[127]    *See id.* ¶ 81.  The Hunt Complaint simply mentions that the analyst
learned of some unspecific "regulatory issues" while plaintiffs explain in their
brief that this pertains to the necessary FDA approval. *See* Pl. Mem. at 14.

[128]    *See Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 n.4 (2d Cir.
2005) (finding that allegations that analysts' downgrades of stock that they had
previously recommended to investors "do not amount to a corrective disclosure . .
. because they do not reveal to the market the falsity of the prior

assertions do not sufficiently plead that a corrective disclosure was a proximate

cause of plaintiffs' losses. As a result, the Complaint must be dismissed for failing

to adequately plead loss causation.

## 2. Plaintiffs Fail to Adequately Plead Their Holder Claims

Plaintiffs allege that they were fraudulently induced to retain

ownership of shares that they bought prior to any alleged misrepresentations or

omissions.[129] Defendants assert that these holder claims are not actionable under the

common law of plaintiffs' resident states and, even if they are, they are not properly

pled.[130]

New York applies the substantive law of each plaintiff's resident state.

"Even if the fraud occurred in New York, where the action is purely economic, it is

_____

recommendations").

[129]    See Def. Mem. at 22-24; Pl. Mem. at 20 (section entitled "Plaintiffs'
Holding Claims are Properly Before this Court"). See In re Worldcom, Inc. Sec.
Litig., 336 F. Supp. 2d 310, 318-19 (S.D.N.Y. 2004) ("A 'holder' action is an
action in which the plaintiffs allege that material misrepresentations or omissions
caused them to retain ownership of securities that they acquired prior to the
alleged wrongdoing.").

[130]    Holder claims are barred under federal securities law. See Blue Chip
Stamps v. Manor Drug Stores, 421 U.S. 723, 730-33 (1975) (limiting private right
of action to purchasers and sellers of securities). Cf. Merrill Lynch, Pierce, Fenner
& Smith, Inc. v. Dabit, – U.S.–, 126 S. Ct. 1503 (2006) (state holders claim
preempted by federal law).

43

governed by the law where plaintiffs suffered their injury which generally is the

place where plaintiffs resided and sustained the economic impact of their loss."[131]

While the viability of so-called holder claims has been addressed in California,

Florida, and Massachusetts, it has not been addressed in South Carolina.

### a.  California, Florida and Massachusetts

In *Small v. Fritz Companies, Inc.*, the Supreme Court of California

recognized common law holder claims but imposed a heightened pleading standard

on the element of reliance on alleged misrepresentations.

> In a holder's action a plaintiff must allege specific reliance on
> the defendants' representations: for example, that if the
> plaintiff had read a truthful account of the corporation's
> financial status, the plaintiff would have sold the stock, how
> many shares the plaintiff would have sold, and when the sale
> would have taken place. The plaintiff must allege actions, as
> distinguished from unspoken and unrecorded thoughts and
> decisions, that would indicate that the plaintiff actually relied
> upon the misrepresentations. Plaintiffs who cannot plead with
> sufficient specificity to show a bona fide claim of actual
> reliance do not stand out from the mass of stockholders who
> rely on the market.[132]

---

[131]     *Dutton*, 2005 WL 146503, at *2 (collecting cases). *Accord Global Fin. Corp.*, 93 N.Y.2d at 529; *see also Odyssey Re (London) Ltd. v. Stirling Cooke Browne Holdings, Ltd.*, 85 F. Supp. 2d 282, 292 (S.D.N.Y. 2000) ("Under New York conflicts of law principles, fraud claims are governed by the state in which the injury is deemed to have occurred, which is usually where the plaintiff is located.") (internal quotation and citation omitted).

[132]     *Small v. Fritz Cos., Inc.*, 30 Cal. 4th 167, 184-85 (2003).

In *Rogers v. Cisco Systems, Inc.*, the federal court predicted that Florida would recognize a cause of action in fraud for holder claims and would require the same specificity as in *Small*.[133]  In *Rogers*, plaintiffs alleged that they relied on defendant's misrepresentations in deciding to retain their shares, but had they known the true financial condition of the company they would have sold their shares before the stock price plummeted as a result of the company's disclosure of accurate financial reports.[134]  The court found that plaintiffs' allegations were too vague to be actionable: "The Plaintiffs allege that they would have sold their stock had they known the truth about Cisco's financial status. However, they do not allege specifically, *how many shares* they would have sold and *when* they would have sold them."[135]  *Rogers* dismissed with leave to amend in accordance with *Small*'s heightened pleading requirements.

While plaintiffs argue that California and Florida courts recognize holder claims, they conveniently ignore *Small*'s heightened pleading requirement of

---

[133]    *See* 268 F. Supp. 2d 1305, 1314 (N.D. Fla. 2003) (quoting the above passage from *Small*).  *Rogers* has not been cited in any other Florida case.

[134]    *See id.* at 1309-10.

[135]    *Id.*

45

the reliance element. Plaintiffs do concede, however, that under *Rogers* plaintiff Pope, a resident of Florida, has not adequately pled her holder claims.[136] In fact, based on the heightened pleading requirements with respect to holder claims in California and Florida, the holder claims of both Roberts and Pope must be dismissed.

The Supreme Judicial Court of Massachusetts has twice held defendants liable for directly making misrepresentations to plaintiffs with the intention of inducing them to hold stock. In *Fottler v. Moseley*, plaintiff gave a sell order to defendant, a stockbroker, who then allegedly lied to plaintiff who recalled his sell order in reliance upon the misinformation.[137] Addressing whether plaintiff's loss was attributable to the alleged fraud, the court stated, "[i]f the fraud operated on plaintiff[] . . . so that he kept his stock when otherwise he would have sold it, and such was the direct, natural, and intended result, then we think that the causal relation between the fraud and the loss is sufficiently made out."[138] Similarly, in

---

[136]    *See* Pl. Mem. at 22 (stating that *Rogers* "indicated that holder claims are actionable, but that plaintiffs had to allege how many shares they would have sold and when they would have sold them. The court granted plaintiff's [sic] leave to amend their complaint to plead this reliance with more specificity.").

[137]    *See* 179 Mass. 295 (1901).

[138]    *Id*. at 299-300.

46

*David v. Belmont*, the court permitted a holder claim where the evidence established

that plaintiff had intended to sell stock he had purchased from defendants but then

retained the stock in reliance upon misrepresentations received directly from

defendants' employee.[139]  These decisions demonstrate that Massachusetts also

imposes a heightened pleading standard for holder claims, requiring a plaintiff to

specify the casual relation between the alleged fraud and resulting harm.  Because

the Cavanagh plaintiffs fail to plead how they specifically relied on the alleged

misrepresentations their holder claims must be dismissed.

### b.  South Carolina

Neither party cites any controlling law from South Carolina on holder

claims, nor has the Court found any.  As a result, this Court must predict whether

that state would allow holder claims.[140]

In order to make such a prediction, the Court must consider any

---

[139]     *See* 291 Mass. 450 (1935).  Both this case and *Fottler* are still good
law.  *See, e.g.*, *Reisman v. KPMG Peat Marwick, LLP*, 57 Mass.App.Ct. 100, 117-
18 (2003).

[140]     *See, e.g., Travelers Ins. Co. v. Carpenter*, 411 F.3d 323, 329 (2d Cir.
2005) ("[O]ur role as a federal court sitting in diversity is not to adopt innovative
theories that may distort established state law.") (internal quotation and citation
omitted). *See also Maska U.S., Inc. v. Kansa Gen. Ins. Co.*, 198 F.3d 74, 78 (2d
Cir. 1999) (in predicting how a state's highest court would resolve an unsettled
legal issue a court may consider decisions in other jurisdictions on the same issue).

47

analogous cases from other jurisdictions.  Defendants rely on this Court's recent

decision in *In re WorldCom, Inc. Securities Litigation* that predicted whether

Georgia would recognize holder claims.[141]  The *WorldCom* Court concluded that

Georgia courts would dismiss plaintiffs' holder claims because plaintiffs failed to

plead what statements induced them to hold their shares, when they would have sold

their stock and in what amounts.[142]

Plaintiffs urge this court to follow the approach taken in *Gutman v.*

*Howard Savings Bank*, where a federal court in New Jersey was forced to predict

how the state courts of New Jersey would treat such claims.[143]  That court began its

analysis by noting the general rule that fraud is actionable regardless of whether the

---

[141]     336 F. Supp. 2d at 318-23.

[142]     *See id.* at 315-16. ("[T]he Amended Complaint states that the 'net
effect' of defendants' alleged misrepresentations and omissions 'was that they
harmed plaintiffs . . . by inducing them to hold their WorldCom securities.' The
Amended Complaint contains no more detailed allegations of reliance. The
Amended Complaint does not state that any false statement in particular was a
substantial factor in a decision to hold stock nor are there allegations about when
and how many shares they would have sold if the [] Plaintiffs had an accurate
picture of WorldCom's financial situation. The Amended Complaint does not
contain any allegations that the [] Plaintiffs received any of the allegedly material
false information in a more direct fashion than any other WorldCom investor.").

[143]     748 F. Supp. 254 (D.N.J. 1990).

victim is induced to act or refrain from acting in reliance upon the fraudulent act.[144]
But the court also noted that in *Blue Chip Stamps v. Manor Drug Stores*,[145] the
United States Supreme Court expressed policy concerns against the application of
this rule in cases alleging securities fraud.[146]  Nonetheless, the *Gutman* court
distinguished *Blue Chip Stamps* by noting that in the typical securities case there is
no personal contact between the parties.[147]  This was not true in the case before that
court.  "One critical feature of the present case [*Gutman*] is generally absent from
the securities market as described by *Blue Chip Stamps*.  Plaintiffs had direct
dealings with defendants in which the latter made certain of the representations
complained of."[148]  The *Gutman* court found that because defendants made
representations directly to the plaintiffs, this was an "ordinary case of deceit" and

---

[144]     *See id.* at 264 (citing Restatement (Second) of Torts § 525 ("[O]ne
who fraudulently makes a misrepresentation . . . for the purpose of inducing
another *to act or refrain from action in reliance* upon it, is subject to liability to
the other in deceit for pecuniary loss caused to him by his justifiable reliance upon
the misrepresentation.")).  Section 525 of the Restatement is also cited in *Small*, 30
Cal. 4th at 174, and *Rogers*, 268 F. Supp. 2d at 1313.

[145]     421 U.S. 723 (1975).

[146]     *See Gutman*, 748 F. Supp. at 265.

[147]     *Id*. at 265-66.

[148]     *Id*. at 266.

should not be dismissed.[149]  However, the court explicitly limited holder claims to instances alleging direct misrepresentations in order to prevent speculative claims.

Here, plaintiffs do not allege that defendants made any misrepresentations directly to them.[150]  In the absence of such allegations, I predict that South Carolina would adopt the reasoning of the United States Supreme Court in *Blue Chip Stamps*, thereby barring holder claims.[151]  If, however, there were allegations of direct misstatements and reliance, then I conclude that South Carolina would permit such claims.  In sum, all of the holder claims are dismissed for failure to state a claim.

---

[149]    *Id. See also id*. ("For a federal court sitting in diversity jurisdiction to create a significant exception to the common law would manifest an unwarranted insensitivity to the courts and legislature of New Jersey, especially if that exception were based on policy considerations pertaining to a federal securities claim.").

[150]    The Hunt Complaint alleges that a consultant paid by defendants told certain unnamed plaintiffs that the price of Enzo stock would soar after the company announced that its treatment for AIDS was successful. *See* Hunt Compl. § 35.  However, this occurred in 1999, or more than six years prior to the filing of this action.  Plaintiffs concede that their holder claims are actionable only for fraud committed by defendants after January 11, 2000. *See* Pl. Mem. at 40.

[151]    It is noteworthy that plaintiffs face a peculiar dilemma – often referred to as being between a rock and a hard place.  If plaintiffs amend their Complaints to definitively allege such direct misrepresentations, then defendants who made such misrepresentation would have minimum contact with the forum states and would be subject to their jurisdiction.  This, in turn, means that the claims  would be time barred.

### 3.   Plaintiffs Have Sufficiently Pled the Elements of a Purchase or Sale and of Reliance

Defendants next argue that plaintiffs have failed to plead the dates and amounts of the purchase or sale of the securities in issue. While defendants are technically right, plaintiffs have now produced their trading records showing the dates of purchase and the price paid. It is a simple matter for plaintiffs to amend their Complaints to add this information.

Defendants also challenge the pleadings for their failure to allege individual and justifiable reliance.[152] Plaintiffs are not required to plead evidence – they are only required to provide sufficient detail to give the defendant fair notice of their claim. Here, plaintiffs have alleged that defendants intentionally made misstatements concerning the success of Enzo's medical treatments and their potential commercial value, and that they relied on such misstatements when they purchased their shares.[153] Plaintiffs also plead that they relied on defendants' statements at the annual shareholders' meeting, in press releases, in news articles

---

[152]   *See* Def. Mem. at 21-22.

[153]   *See* Hunt Compl. ¶¶ 5-9, 25, 95-96, 99-100, 108, 112, 116, 119; Roberts Compl. ¶¶ 5-9, 21, 91.

and to brokers and analysts, all of which are identified with specificity.[154] This is sufficient to plead reliance.

### D.     Leave to Amend

Plaintiffs have requested leave to amend their Complaints should this Court find the Complaints deficient.[155] Rule 15(a) provides that leave to amend "shall be freely granted when justice so requires." Accordingly, "[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead."[156] Therefore, plaintiffs are granted leave to replead within twenty days of this Opinion and Order in a manner consistent with this Opinion.

## V.     CONCLUSION

---

[154]     *See* Hunt Compl. ¶¶ 28-35, 38-53, 58-59, 67-75, 77-79, 82-88.  In addition, California had embraced the concept of indirect reliance.  In *Mirkin v. Wasserman*, the California Supreme Court held that "[t]he maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transaction involved." 5 Cal. 4th 1082, 1098 (1993) (internal quotation and citation omitted).  If defendants eventually renew their motion to dismiss they may present evidence that their alleged misrepresentations were transmitted by their agents (such as brokers or consultants) to plaintiffs in their home states.

[155]     *See* Pl. Mem. at 40.

[156]     *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991).

52

For the foregoing reasons, defendants' motion to dismiss the Complaint as time-barred is denied with leave to renew, except as to the Hunt plaintiffs, whose claims are time-barred. The motion to dismiss by DeLucca and the Rabbanis are granted as to all claims based on plaintiffs' failure to plead fraud with particularity. The motion to dismiss by Gross is granted as to the Roberts Complaint and denied as to the Hunt Complaint. In addition, all claims are dismissed for failure to allege loss causation and all of the holder claims are dismissed. Plaintiffs, other than the Hunt plaintiffs, are granted leave to replead within twenty days of this Opinion and Order. The Clerk of the Court is directed to close this motion [Docket No. 18].

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            December 11, 2006

53

## -Appearances-

*For Plaintiffs*:

Michael J. Rovell, Esq.
Alyssa E. Griffin, Esq.
Law Offices of Michael J. Rovell
20 North Clark Street, Suite 2450
Chicago, IL 60602
(312) 578-9191

Daniel Eigerman, Esq.
260 Madison Avenue, 18th Floor
New York, NY 10016
(212) 213-6866

J. Stephen Walker, Esq.
Law Offices of J. Stephen Walker, P.C.
622 River Street
Ontonagon, MI 49953
(906) 884-2466

*For the Enzo Defendants*:

Donald H. Chase, Esq.
Morrison Cohen, LLP
909 Third Avenue
New York, NY 10022
(212) 735-8600

*For Defendant Heiman Gross*:

Angelo Anthony Stio, III, Esq.
Pepper Hamilton LLP
300 Alexander Park
Princeton, NJ 08543
(609) 951-4125