UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 1/9/08

FRANCIS SCOTT HUNT and SHUNDRA
CHERI HUNT, individually and as Trustee
for IAN CHRISTOPHER HUNT,
LAWRENCE A. MCMAHON
and JUDITH J. MCMAHON, PAUL D.
CAVANAGH individually and as Trustee
for the PAUL D. CAVANAGH TRUST,
and VIRGINIA POPE,

                Plaintiffs,

           - against -

ENZO BIOCHEM, INC., HEIMAN GROSS,
BARRY WEINER, ELAZAR RABBANI,
SHARIM RABBANI, JOHN DELUCCA,
DEAN ENGELHARDT, and JOHN DOES 1-50,

                Defendants.

**OPINION AND ORDER**

06 Civ. 170 (SAS)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

KEN ROBERTS,

                Plaintiff,

           - against -

06 Civ. 213 (SAS)

ENZO BIOCHEM, INC., HEIMAN GROSS,
BARRY WEINER, ELAZAR RABBANI,
SHARIM RABBANI, JOHN DELUCCA,
DEAN ENGELHARDT, and JOHN DOES 1-50,:

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
                                              :
PAUL LEWICKI,
                                              :
           Plaintiff,                                06 Civ. 6347 (SAS)
                                              :
     - against -
                                              :
ENZO BIOCHEM, INC., HEIMAN GROSS,
BARRY WEINER, ELAZAR RABBANI,                 :
SHARIM RABBANI, JOHN DELUCCA,
DEAN ENGELHARDT, and JOHN DOES 1-50,:

           Defendants.                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
```

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

Enzo Biochem, Inc. ("Enzo" or the "Company"), a public company

incorporated in 1970, has been engaged in the research and development of

treatments to fight the human immunodeficiency virus ("HIV") and other disease.

Plaintiffs are individuals who invested in Enzo securities. Defendants include the

Company, several officers and directors, and an outside consultant.[1] Plaintiffs

allege that they suffered financial losses by relying on defendants' misstatements

---

[1]      Barry Weiner is Enzo's President and a member of its Board of
Directors. Elazar Rabbani is Chief Executive Officer and his brother, Sharim
Rabbani, is Chief Operating Officer. The Rabbanis are also members of Enzo's
Board of Directors. Dean Engelhardt is Enzo's Executive Vice President and
Heiman Gross is an outside consultant.

and omissions when deciding to purchase, hold, and sell Enzo securities.[2] The

gravamen of plaintiffs' common law fraud claims is that defendants conspired to

inflate the price of Enzo stock through a series of misrepresentations and

omissions concerning the efficacy of Enzo's medical treatments in order to sell

their shares at artificially inflated prices. This Court has diversity jurisdiction over

this matter pursuant to section 1332 of Title 28 of the United States Code. Venue

in this district is proper pursuant to section 1391(a) of Title 28 of the United States

Code.

Defendants previously filed a motion to dismiss on the ground that,

inter alia, plaintiffs failed to adequately plead loss causation. On December 11,

2006, this Court issued an Opinion and Order (*"Hunt I"*), familiarity with which is

assumed, granting defendants' motion to dismiss.[3] That Order dismissed the

claims against Elazar Rabbani, Sharim Rabbani, and John Deluca under Federal

Rule of Civil Procedure 9(b) ("Rule 9(b)") because plaintiffs failed to plead fraud

---

²     On March 31, 2006, I consolidated two actions, *Hunt v. Enzo Biochem, Inc.*, 06 Civ. 170 and *Roberts v. Hunt Biochem, Inc.*, 06 Civ. 213, and closed the latter. However, the remaining Hunt plaintiffs and Roberts continue to file separate Complaints in their respective actions. I will therefore treat the two actions as unconsolidated for purposes of this motion.

³     *See Hunt v. Enzo Biochem, Inc.*, 471 F. Supp. 2d 390 (S.D.N.Y. 2006) (*"Hunt I"*).

3

with sufficient particularity against these defendants.[4]  Moreover, the claims

brought by plaintiffs Francis Scott Hunt and Shundra Cheri Hunt were dismissed

with prejudice as time-barred.[5]  The remaining plaintiffs were given leave to

replead within twenty days of *Hunt I*.[6]

In an effort to cure the deficiencies in their original Complaint, the

plaintiffs in each action filed a First Amended Complaint.[7]  The remaining

defendants – Enzo, Barry Weiner, Elazar Rabbani,[8] Dean Engelhardt, and Heiman

Gross[9] – once again move to dismiss plaintiffs' common law fraud claims on the

following grounds: (1) that plaintiffs failed to allege the purchase and sale of

---

[4]     *See id.* at 408.

[5]     *See id.* at 403 n.90, 414.

[6]     *See id.* at 393, 413.

[7]     On January 3, 2007, plaintiffs Lawrence A. McMahon, Judith
McMahon, Paul D. Cavanagh, and Virginia Pope filed a First Amended Complaint
("First Amend. Compl.") in the Hunt action.  Plaintiff Ken Roberts filed a First
Amended Complaint in the Roberts action and plaintiff Paul Lewicki filed a First
Amended Complaint in the Lewicki action.

[8]     Although *Hunt I* dismissed Elazar Rabbani as a defendant under Rule
9(b), plaintiffs have once again attempted, albeit unsuccessfully, to assert a claim
against him.

[9]     Defendant Heiman Gross filed separate memoranda of law in support
of defendants' motion to dismiss plaintiffs' Amended Complaints.

4

Enzo securities;[10] and (2) that plaintiffs failed to sufficiently plead loss causation.

Defendants also move to dismiss plaintiffs' holder claims as well as the claims

against Elazar Rabbani. In their opposition to defendants' motion to dismiss,

plaintiffs submitted Proposed Amended Complaints to cure any outstanding

deficiencies – plaintiffs Cavanagh and Pope[11] filed a Third Amended Complaint

("Hunt Prop. Compl.")[12] while Roberts and Lewicki each filed a Second Amended

Complaint ("Roberts Prop. Compl." and "Lewicki Prop. Compl.").[13] Plaintiffs

seek leave to file their Proposed Amended Complaints should this Court dismiss

their First Amended Complaints.[14] For the following reasons, defendants' motion

to dismiss is granted in part and denied in part.

---

[10] This ground can be summarily dismissed given the purchase and sale allegations contained in the Proposed Amended Complaints. *See infra* Part II(F).

[11] On August 27, 2007, the claims of Lawrence and Judith J. McMahon were dismissed with prejudice in an Order of the same date.

[12] *See* 9/7/07 Declaration of Dan Brecher, counsel for plaintiffs Paul D. Cavanagh, Virginia Pope, Ken Roberts, and Paul Lewicki, Ex. B.

[13] *See id.* Exs. C and A.

[14] *See* Memorandum of Law in Opposition to Motion to Dismiss Amended Complaint ("Opp. Mem.") at 1, 10. Because the allegations in plaintiffs' Proposed Amended Complaints have been refined as much as possible, I will deem these Complaints filed for purposes of this motion. My analysis, therefore, will focus on the allegations contained in the Proposed Amended Complaints.

5

## II. BACKGROUND[15]

### A. Overview of the Conspiracy

Plaintiffs allege that defendants entered into a "pump and dump"
scheme in which they first fraudulently inflated the price of Enzo stock
through a series of misrepresentations and omissions, and then sold their stock at
artificially inflated prices. The misrepresentations and omissions related to: "(a)
Enzo's patent estate; (b) the progress of its HIV pre-clinical and clinical trials; (c)
the efficacy of its gene therapy; and (d) the timing of a major transaction with a
pharmaceutical company."[16] The misrepresentations were made at an annual
shareholders' meeting held on January 12, 2000, which plaintiffs attended,[17] in
press releases and news articles, and through the dissemination of insider
information to stockbrokers and analysts.

Within a few months of the January 2000 shareholders' meeting, the
individual defendants sold large amounts of their stock at allegedly artificially

---

[15]     Except where otherwise noted, the following allegations are drawn
from the Proposed Amended Complaints and are presumed to be true for purposes
of this motion.

[16]     Hunt Prop. Compl. ¶ 20; Roberts Prop. Compl. ¶ 19; Lewicki Prop.
Compl. ¶ 18.

[17]     *See id.* ¶¶ 2 ("The misrepresentations . . . were made . . . at the
Company's 2000 annual shareholders' meeting, which the Plaintiffs personally
attended."), 22, 112; *id.* ¶¶ 2 (same), 21, 106; *id.* ¶¶ 2 (same), 20, 105.

6

inflated prices. DeLucca sold all of his Enzo shares for approximately two million dollars.[18] Weiner and the Rabbanis collectively "transferred, sold, hedged or constructively sold 600,000 shares of Enzo stock on March 28, 2000, that had an inflated market value of $48 million."[19] Engelhardt sold approximately $350,000 of shares in March 2000.[20] Within approximately two weeks of these sales, the market price of Enzo stock declined precipitously, closing at $81 per share on March 28, 2000, but dropping to $35 per share on April 14, 2000.[21]

## B. The Misrepresentations and Omissions

### 1. The January 2000 Shareholders' Meeting

Numerous misrepresentations were made at the annual shareholders' meeting on January 12, 2000, and were largely responsible for the rise in the price of Enzo stock from $43 per share to an all-time high of $139 per share on January 24, 2000.[22] At that meeting, Weiner and Engelhardt, Enzo's President and Executive Vice President, respectively, made several deliberate misstatements concerning Enzo's progress in developing a new gene therapy for HIV.

---

18  *See id.* ¶ 88; *id.* ¶ 83; *id.* ¶ 82.

19  *Id.* ¶ 93; *Id.* ¶ 88; *Id.* ¶ 87.

20  *See id.* ¶ 92; *id.* ¶ 87; *id.* ¶ 86.

21  *See id.* ¶ 94 and Ex. 5; *id.* ¶ 89 and Ex. 5; *id.* ¶ 88 and Ex. 5.

22  *See id.* ¶ 104; *id.* ¶ 99; *id.* ¶ 98.

Engelhardt's misrepresentations included the following:

- Engelhardt's statement that Enzo's gene therapy for HIV/AIDS and its gene therapy for Hepatitis B "works, they both work."[23]

- Engelhardt's comparison of Enzo's treatment to a "Roach Motel" in that "the virus goes in but does not come out." Engelhardt also stated that "although the FDA would not allow the Company to say that it cured AIDS, the Company had, in fact, killed the virus."[24]

At the same shareholders' meeting, Weiner made the following misrepresentations:

- that Enzo would open three clinics, totaling four, to treat HIV and AIDS patients by the end of fiscal 2000. Weiner predicted that Enzo could treat 9,500 patients per clinic at a charge of $30,000 per patient. Weiner failed to disclose that Enzo needed FDA approval to open any of these clinics, approval that Enzo had not even sought.[25]

- that Enzo "had submitted the Phase I data to the FDA and was awaiting approval of a Phase II" even though "Enzo never had any data upon which the FDA could base a Phase II approval."[26]

---

[23]   *See id.* ¶ 26; *id.* ¶ 25; *id.* ¶ 24.

[24]   *Id.* ¶ 28; *Id.* ¶ 27; *Id.* ¶ 26.

[25]   *See id.* ¶ 29; *id.* ¶ 28; *id.* ¶ 27.

[26]   *Id.* ¶ 30; *Id.* ¶ 29; *Id.* ¶ 28.

- that HGTV-43, a component of Enzo's new gene therapy that delivered genes to certain cells to enhance immune responses in a process called transduction, had reduced the time required for successful transduction from a period of up to three months to eighteen hours.[27]

- that Enzo had made a technical breakthrough because "HGTV-43, Enzo's gene transfer vector, was able to achieve levels of stable gene transfer (transduction) to the patients' non-growing blood stem cells greater than 30%"[28]

- that HGTV-43 was ready for commercialization.[29]

## 2.     Press Releases

Engelhardt and Weiner repeated some of the same misrepresentations concerning the efficacy of Enzo's gene therapy to the press. For example, in a January 20, 2000 Business Week article, Weiner was quoted as noting that the clinical trials have produced "impressive positive results."[30] In a Business Week Online article dated January 31, 2000, Weiner again stated that Enzo's clinical trials produced "impressive positive results."[31] In a Dow Jones News Service

27     *See id.* ¶ 31; *id.* ¶ 30; *id* ¶ 29.

28     *Id.* ¶ 33; *Id.* ¶ 32; *Id.* ¶ 31.

29     *Id.* ¶ 34; *Id.* ¶ 33; *Id.* ¶ 32.

30     *Id.* ¶ 42; *Id.* ¶ 41; *Id.* ¶ 40.

31     *Id.* ¶ 43; *Id.* ¶ 42; *Id.* ¶ 41.

9

release published on February 16, 2000, Weiner was quoted as stating: "We can stop the virus cold," and Engelhardt was reported to have said that Enzo's treatment "makes the virus disappear."[32] In that same news release, Weiner and Engelhardt reportedly said that Enzo's clinical trials "have gleaned promising data."[33] Engelhardt was further quoted as stating: "Using genetic antisense, we are creating a cell that (can be) permanently resistant to the HIV virus [sic]."[34] Weiner also spoke of the planned expansion of Enzo's clinical trials in that release.[35]

Plaintiffs further allege that "[a]fter the market price of the stock collapsed to $35, Enzo issued a press release on April 13, 2000 stating that it had no explanation for the collapse in the price of the stock, all remained well with Enzo, and the human trials currently being conducted were on schedule."[36] The April 13, 2000 press release also claimed that Enzo had two hundred patents worldwide, when in reality Enzo only had thirty-six patents, the remainder being

---

[32]  *Id.* at ¶ 42; *Id.* at ¶ 41; *Id.* at ¶ 40.

[33]  *Id.* ¶ 45; *Id.* ¶ 44; *Id.* ¶ 43.

[34]  *Id.*

[35]  *See id.* ¶ 46; *id.* ¶ 45; *id.* ¶ 44.

[36]  *Id.* ¶ 47; *Id.* ¶ 46; *Id.* ¶ 45.  Enzo stock actually closed at $35 per share on April 14, 2000, as indicated in the chart of "Historical Prices of Enzo Biochem, Inc. January 1, 2000 Through December 31, 2000," appended to each Proposed Complaint as Exhibit 5.

10

the same patents issued in other countries.[37] In the same press release, Enzo stated, inter alia, that: the University of California clinical study was moving to its final stages; Enzo knew of no other system that achieved the results that its gene therapy had achieved; and that plans for Phase II trials were proceeding.[38]

In a press release dated October 2, 2000, Enzo stated that the "new data on the first individual treated in the Phase I clinical trial of HGTV-43, the company's HIV-1 gene [therapy], show that after nine-and-one-half-months Enzo engineered cells have successfully engrafted in the patient's bone marrow and were spawning new differentiated CD4+ cells designed to fight the virus."[39] However, the engraftment had actually failed and Enzo's treatment had not met any of the recognized clinical markers of an effective HIV treatment – namely, increased T-cell count and lower viral loads.[40]

## C. Loss Causation

Plaintiffs claim that the inflated price of Enzo's stock was corrected by: (1) constructive corrective notice; and (2) the disclosure of a private

---

[37]    *See id.* ¶ 54; *id.* ¶ 53; *id.* ¶ 52.

[38]    *See id.* ¶ 49; *id.* ¶ 48; *id.* ¶ 47.

[39]    *Id.* ¶ 68; *Id.* ¶ 63; *Id.* ¶ 62.

[40]    *See id.* ¶ 69; *id.* ¶ 64; *id.* ¶ 63.

placement memorandum from Union Bank of Switzerland (the "UBS PPM").[41]

Constructive corrective notice occurred "[w]hen events that were the subject of

misrepresentation did not occur – for example, the opening of further clinics,

significant headway in the cure for AIDS, or the commencement of Phase II –

[and] the stock price foreseeably dropped."[42] Specifically, plaintiffs allege that:

> During the three months following the annual stockholders
> meeting, no clinics were opened, no further announcement
> was made regarding Enzo's cure for AIDS or that it had
> moved from Phase I to Phase II testing. At the end of
> March 2000, the market, based on Enzo's January 2000

---

[41] Plaintiffs' First Amended Complaint makes specific allegations regarding the nature of the purported corrective disclosures contained in the UBS PPM. *See* First Amend. Compl. ¶ 105. Additionally, plaintiffs attached a portion of the UBS PPM as an exhibit to the First Amended Complaint. *See* 7/21/00 UBS PPM Section on Risk Factors, Ex. 5 to First Amend. Compl. Subsequent amendments to plaintiffs' complaints, including the most recent proposed amended complaints, omit allegations regarding the content of the UBS PPM on the ground that the document is subject to a protective order pursuant to proceedings in the Eastern District of Virginia. *See* Hunt Prop. Compl. ¶¶ 101, 111. The content of the UBS PPM is significant to the motion at issue, and as such, the Court requested and received a copy from Donald H. Chase, counsel to the Enzo defendants, by letter dated December 27, 2007. Because the UBS PPM has been incorporated into the complaint by reference, I consider its contents and describe it accordingly. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 127 S. Ct. 2499, 2509 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference . . . .") (citing 5B Charles Alan Wright & Arthur R. Miller *Federal Practice and Procedure* § 1357 (3d ed. 2004 and Supp. 2007)).

[42] *Id.* ¶ 102 ; *Id.* ¶ 97; *Id.* ¶ 96.

12

statements, anticipated an announcement regarding the imminent opening of the clinics and the move to Phase II testing. Nothing occurred. By mid-April, when the clinics were to have opened[,] the stock dropped precipitously from the $80 per share price range to approximately $35 per share.[43]

In sum, "Enzo['s] and the individual defendants' failure to make timely announcements of scheduled events consistent with statements made at the January 2000 shareholders meeting acted as constructive notice of their [earlier] misstatements and was accepted by the market as such, which led to the aforesaid dissipation of the market price of Enzo stock."[44]

Similarly, plaintiffs allege that the price of Enzo stock dropped when the UBS PPM was disclosed to certain members of the institutional investment community.[45] They contend that the UBS PPM acted as a corrective disclosure "to a substantial segment of the institutional investment community . . . regarding the bullish statements and prospects that Enzo outlined at the annual shareholders meeting."[46] The UBS PPM sets forth a number of "risk factors" that investors are advised to consider prior to making an investment decision. Most of the factors

[43]    *Id.* ¶ 106; *Id.* ¶ 101; *Id.* ¶ 100.

[44]    *Id.* ¶ 119; *Id.* ¶ 114; *Id.* ¶ 112.

[45]    *See id.*; *id.*; *id.*

[46]    *Id.* ¶¶ 114-115; *Id.* ¶¶ 108-109 ; *Id.* ¶¶ 107-108.

13

contain standard cautionary language regarding the risks inherent in any investment, particularly investments in biotechnology companies. The UBS PPM, however, does contain certain statements that can be considered to counter statements made at the January 2000 shareholders' meeting. For example, at that meeting, shareholders were allegedly told that "the Company had submitted the Phase I data to the FDA and was awaiting approval of a Phase II."[47] The UBS PPM, however, reported that the Company was "preparing an application for a Phase II study . . . .,"[48] over seven months after the shareholders' meeting. Additionally, the UBS PPM makes no mention of any breakthrough in the treatment of HIV or AIDS, the imminent commercialization of HGTV-43, nor the anticipated opening of any additional clinics. Rather, the UBS PPM contains information regarding the "high risk of failure" of the Company's product development efforts,[49] and the fact that the Company "will need to conduct significant additional research and pre-clinical testing and clinical trials before [it] can file applications with the FDA for product approval."[50]

---

[47]    *Id.* ¶ 30; *Id.* ¶ 29; *Id.* ¶ 28.

[48]    UBS PPM at 2.

[49]    *Id.* at 8.

[50]    *Id.* at 6.

14

According to plaintiffs, on the day the UBS PPM began circulating –

July 25, 2000 – the volume of trading activity sharply increased (and continued to

increase on the following day)[51] and the price of Enzo stock dropped from $72 per

share to approximately $57 per share during the last hour of trading on that same

day.[52]  Upon information and belief, this drop was a direct result of information

relating to the Company set forth in the UBS PPM.[53]

## D.  Holder Claims

### 1.  Cavanagh

Cavanagh alleges the following with regard to his so-called "holder"

claim:

> Plaintiff Cavanagh bought Enzo and continued to hold
> Enzo based on the representation that Enzo's gene therapy
> was effective and that it would soon be announcing a cure
> for HIV and obtaining FDA approval to allow it to
> commercialize its product. Had Plaintiff Cavanagh known
> that the representations made at the annual shareholders
> meeting were false, he would have sold all of his shares
> into the market during the month of January 2000, and, in
> particular, when the stock was trading at around $100 per

---

[51]     *See* Historical Prices of Enzo Biochem, Inc. January 1, 2000 through
December 31, 2001, Ex. 5 to Hunt Prop. Compl.

[52]     *See* Hunt Prop. Compl.¶ 113; Roberts Prop. *Compl.*¶ 107; Lewicki
Prop. Compl.¶ 106.

[53]     *See id.*; *id.*; *id.*

15

> share. Specifically, as of the January 12, 2000 annual
> shareholders meeting, Plaintiff Cavanagh held 644,211
> shares of Enzo which had been purchased over the time
> period 1996 through 1999. Plaintiff Cavanagh would have
> sold these shares immediately in January had the truth
> concerning the efficacy of the Company's gene therapy and
> its commercial viability been disclosed to him. Instead,
> fraudulent statements were issued at the annual
> shareholders meeting and thereafter upon which Cavanagh
> relied in retaining such shares.[54]

With regard to reliance, Cavanagh alleges that he "had continually been assured by

Defendants Gross and Weiner and by Keating that the Company's gene therapy

was effective, which was the only reason that [he] invested and continued to hold

Enzo shares."[55]

### 2. Pope

Pope alleges that her purchase, accumulation, and retention decisions

during the period from 1999 through 2002 were made in good faith reliance upon

defendants' representations.[56] Although Pope placed a stop order with her broker

on January 24, 2000, her broker did not sell any of her Enzo shares and, in fact,

convinced Pope to purchase more Enzo stock.[57] In purchasing and retaining Enzo

---

[54] Hunt Prop. Compl. ¶ 143.

[55] *Id.* ¶ 146.

[56] *See id.* ¶ 150.

[57] *See id.* ¶ 151.

16

stock, Pope relied on the positive representations made by her broker, who was allegedly privy to defendants' insider information.[58] Pope claims that had she known that the representations made at the shareholders' meeting were false, she would have sold all of her Enzo stock in January 2000, when it was trading around $100 per share.[59] Alternatively, Pope claims that she would have sold her 4,000 Enzo shares on "July 11 or July 18, 2000, when the shares were trading at $75 per share had the truth concerning the efficacy of the Company's gene therapy and its commercial viability been disclosed to her."[60] Pope, too, claims that she "had continually been assured by Defendants Gross and Weiner that the Company's gene therapy was effective, which was the only reason that [she] invested in and continued to hold the Enzo shares."[61]

### 3. Roberts

Roberts alleges that he would have sold his 25,000 shares of Enzo stock "on July 11, 2000 or July 18, 2000, when the stock was trading at $75 a

---

[58]    *See id.*

[59]    *See id.* ¶ 152.

[60]    *Id.* ("If Plaintiff had been provided with the same information as was provided in the UBS PPM (which was known to Defendants throughout 2000), Plaintiff would have sold these shares in early July 2000, as set forth above.").

[61]    *Id.* ¶ 155.

17

share."[62] Similar to Cavanagh and Pope, Roberts claims he held his Enzo shares

because of the continuous assurances made by Gross and Weiner.[63]

## E.    Allegations Against Elazar Rabbani

In an attempt to resurrect their claims against defendant Elazar

Rabbani, each plaintiff alleges the following in the Proposed Amended

Complaints:

> At the 2000 annual shareholders meeting, both defendants
> Weiner and Engelhardt gave presentations that had been
> pre-approved by defendant Elazar Rabbani, who has a PhD
> and is the Chief Executive Officer of Enzo with overall
> responsibility for all of Enzo's technology, including its
> gene therapy.    Defendant Rabbani also spoke at the
> shareholders meeting and endorsed the progress that
> allegedly had been made over the previous year, including,
> but not limited to, the claims related to Enzo's gene
> therapy.    Defendant Rabbani conspired with defendants
> Weiner, Engelhardt and Gross, as well as Sharim Rabbani
> and John DeLucca, to overstate the progress of the gene
> therapy, particularly its effectiveness in the treatment of
> AIDS, in order to increase the market price of Enzo's
> stock.[64]

Furthermore, with regard to the misrepresentations made by Weiner and

---

[62]    Roberts Prop. Compl.¶ 139.

[63]    *See id.* ¶ 142.

[64]    Hunt Prop. Compl.¶ 23; Roberts Prop. Compl.¶ 22; Lewicki Prop.
Compl.¶ 21.

18

Engelhardt at the January 2000 shareholders' meeting, plaintiffs allege: "Such statements and omissions were made with defendant Rabbani's knowledge and connivance, and defendant Rabbani did nothing during or after the meeting to correct these statements even though he knew these statements to be untrue."[65]

## F.     Purchase and Sale of Enzo Securities

In *Hunt I*, I stated that it was a "simple matter" for plaintiffs to amend their complaints to add purchase and sale information.[66]  Despite this instruction, plaintiffs' former counsel failed to include purchase and sale transactions in plaintiffs' First Amended Complaints.  This omission has been corrected in the Proposed Amended Complaints, which include both allegations of specific transactions in Enzo securities as well as schedules detailing each plaintiff's purchase and sale activity.

For example, Pope purchased 4,000 shares of Enzo stock in March 2000 for a total purchase price of $332,235.[67]  These shares were sold on December 19, 2000, for $109,437, resulting in a loss of $227,798.[68]  Pope also

---

[65]     *Id.* ¶ 39; *Id.* ¶ 38; *Id.* ¶ 37.

[66]     *Hunt*, 471 F. Supp. 2d at 414.

[67]     *See* Hunt Prop. Compl., Ex. 6.

[68]     *See id.*

19

purchased 1,000 shares on June 26, 2000, for $68,279, which were sold on

November 22, 2000, for $32,906. Five hundred more shares were purchased on

July 12, 2000, for $37,342, which were sold on November 29, 2000, for $16,094.

Finally, Pope purchased 400 shares on August 31, 2000, for $24,353, which she

sold on December 5, 2000, for $11,210. Cavanagh purchased 5,500 shares of

Enzo on January 24, 2000 for $537,114; 5,000 shares on February 7, 2000 for

$332,224; 5,000 shares on March 30, 2000 for $353,036; and 500 shares on

October 31, 2000 for $6,250.[69] Cavanagh alleges that under the first-in first-out

("FIFO") method of accounting,[70] he sold these 15,500 shares on September 18

and 19, 2001, for a total price of $258,902, which resulted in a loss of

approximately $963,472.

As of mid-April 2000, Roberts held approximately 40,000 shares of

Enzo stock.[71] These shares were purchased in February, March, and April 2000.[72]

Specifically, 10,000 shares were purchased on February 17,

---

[69]   *See id.* ¶ 108 and Ex. 7.

[70]   Courts prefer the last-in first-out method of accounting and have
"generally rejected FIFO as an appropriate means of calculating losses in
securities fraud cases." *In re eSpeed, Inc. Sec. Litig.*, 232 F.R.D. 95, 101
(S.D.N.Y. 2005) (quotation marks and citation omitted).

[71]   *See* Roberts Prop. Compl.¶ 102 and Ex. 6.

[72]   *See id.*

2000, which were not sold until September 12, 2000 (5,000 shares sold) and November 21, 2000 (5,000 shares sold); 5,000 shares were purchased on March 14, 2000 which were not sold until December 20 and 21, 2000; 3,700 shares were purchased on March 16, 2000 and 6,300 shares were purchased on March 17, 2000 which were not sold until November 24 through November 20, 2000 [sic]; 5,000 shares were purchased on March 17, 2000, 5,000 on March 20, 2000 and 1,500 on March 23, 2000, all of which were not sold until July 18, 2000; and 3,500 shares were purchased on March 23, 2000 which were not sold until November 29, 2000.[73]

Roberts claims to have incurred losses in the amount of $1,330,400 as a result of these transactions.[74]

Lewicki held approximately $87,120 in call options on Enzo stock as of mid-April 2000.[75] These options expired on April 24, 2000, resulting in an alleged loss of $87,120.[76] As of July 26, 2000, Lewicki held approximately $137,750 in call options, which were purchased on July 17, July 21, and July 24, 2000.[77] These options expired on August 19, 2000, resulting in a total loss.[78]

---

[73]   *Id.* ¶ 102.

[74]   *See id.*

[75]   *See* Lewicki Prop. Compl. ¶ 101.

[76]   *See id.*

[77]   *See id.* ¶ 109.

[78]   *See id.*

21

## III. LEGAL STANDARDS

### A. Motion to Dismiss

"Federal Rule of Civil Procedure 8(a)(2) requires . . . 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"[79] Before *Bell Atlantic v. Twombly*, it was appropriate to grant a motion to dismiss under Rule 12(b)(6) where it appeared "beyond doubt that the plaintiff can prove no set of facts in support of [its] claim which would entitle [it] to relief.'"[80] The test is no longer whether there is "'no set of facts'" that plaintiff could prove "'which would entitle him to relief.'"[81] Rather, the complaint must provide "the grounds upon which [the plaintiffs'] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'"[82]

When deciding a motion to dismiss under Rule 12(b)(6), the court

---

[79]    *Erickson v. Pardus*, — U.S. — , 127 S. Ct. 2197, 2200 (2007) (quoting Fed. R. Civ. P. 8(a)(2)).

[80]    *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

[81]    *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1969 (2007) (quoting *Conley v. Gibson*, 355 U.S. at 45-46 ("The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard . . . .")).

[82]    *ATSI Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atlantic*, 127 S. Ct. at 1965).

must "accept as true all of the factual allegations contained in the complaint"[83] and "draw all reasonable inferences in plaintiff's favor."[84] Even though plaintiff's allegations are taken as true, the claim may still fail as a matter of law if the claim is not legally feasible.[85] In other words, to survive a 12(b)(6) motion to dismiss, the allegations in the complaint must meet the standard of "plausibility."[86] Although the complaint need not provide "detailed factual allegations,"[87] it must "amplify a claim with some factual allegations . . . to render the claim *plausible*."[88] In addition, "bald assertions and conclusions of law will not suffice."[89] Moreover, a court need not accord "legal conclusions, deductions or opinions couched as

---

[83]     *Bell Atlantic*, 127 S. Ct. at 1964.

[84]     *Ofori-Tenkorang v. American Int'l Group, Inc.*, 460 F.3d 296, 298 (2d Cir. 2006).

[85]     *See Allaire Corp. v. Okumus*, 433 F.3d 248, 250 (2d Cir. 2006).

[86]     *See Bell Atlantic*, 127 S. Ct. at 1970.

[87]     *Id.* at 1964.  *Accord ATSI*, 493 F.3d at 98 n.2 (applying the standard of plausibility outside *Twombly's* anti-trust context) .

[88]     *Iqbal v. Hasty*, 490 F.3d 143, 157-58 (2d Cir. 2007) (emphasis in original) (holding that the complaint adequately alleged the personal involvement of the Attorney General because it was plausible that officials of the Department of Justice would be aware of policies concerning individuals arrested after the events of September 11, 2001.

[89]     *Law Offices of Curtis v. Trinko, L.L.P. v. Bell Atlantic Corp.*, 309 F.3d 71, 74 (2d Cir. 2002) (quotation marks omitted).

23

factual allegations . . . a presumption of truthfulness."[90]

While consideration of a motion to dismiss under Rule 12(b)(6) is generally limited to consideration of the complaint itself, consideration of materials outside the complaint "is not entirely foreclosed."[91] The court "may [also] consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."[92]

## B.   Common Law Fraud

To recover damages for fraud under New York law, a plaintiff must prove the following by clear and convincing evidence:  (1) a misrepresentation or omission of material fact; (2) that the defendant knew to be false; (3) that the defendant made with the intention of inducing reliance; (4) upon which the plaintiff reasonably relied; and (5) that caused injury to the plaintiff.[93]  "The claim

---

[90]     *In re NYSE Specialists Sec. Litig.*, No. 06-1038-cv, 2007 WL 2701341, at *5 (2d Cir. Sept. 18, 2007) (quotation marks and citation omitted).

[91]     *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).

[92]     *ATSI*, 493 F.3d at 98.

[93]     *See Crigger v. Fahnestock and Co., Inc.*, 443 F.3d 230, 234 (2d Cir. 2006) (citing *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997)). *Accord Wynn v. AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001).

24

also requires a showing of proximate causation, such that the injury 'is the natural and probable consequence of the defrauder's misrepresentation or . . . the defrauder ought reasonably to have foreseen that the injury was a probable consequence of his fraud.'"[94]

"[B]ecause [the elements of common law fraud] are substantially identical to those governing § 10(b), the identical analysis applies."[95] "It is long settled that a securities-fraud plaintiff 'must prove both transaction and loss causation.'"[96] "Transaction causation is akin to reliance, and requires only an allegation that 'but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction.'"[97] "The concept of loss causation elucidated" by the Supreme Court in *Dura*

---

[94] *Suez Equity Investors, L.P. v. Toronto-Dominion Bank,* 250 F.3d 87, 104-05 (2d Cir. 2001) (quoting *Cumberland Oil Corp. v. Thropp*, 791 F.2d 1037, 1044 (2d Cir. 1986)).

[95] *Rich v. Maidstone*, No. 98 Civ. 2569, 2002 WL 31867724, at *13 (S.D.N.Y. Dec. 20, 2002) (quotation marks and citation omitted).

[96] *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (quoting *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 769 (2d Cir. 1994)).

[97] *Id.* (quoting *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir. 2003)).

25

*Pharmaceuticals, Inc. v. Broudo*[98] is "closely related to the common law doctrine

of proximate cause."[99] "*Dura* culls from the common law the black letter law that

a fraud plaintiff must show that he acted on the basis of the fraud and suffered

pecuniary loss as a result of so acting."[100] A defendant's alleged "misstatement or

omission is the 'proximate cause' of an investment loss if the risk that caused the

loss was within the zone of risk concealed by the misrepresentations and

omissions alleged by a disappointed investor."[101]

A claim for common law fraud under New York law must also satisfy

---

[98] 544 U.S. 336 (2005).

[99] *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 183 (2d Cir. 2007) (citing *Dura*, 544 U.S. at 343-44).

[100] *Id. Accord Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 157 (2d Cir. 2007) ("'Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff.'") (quoting *Lentell*, 396 F.3d at 172).

[101] *Lentell*, 396 F.3d at 173. *Accord Lattanzio*, 476 F.3d at 157. In *Lattanzio*, the Second Circuit held that plaintiffs failed to allege a sufficient connection between the auditor's misstatements and the losses caused by the company's bankruptcy. The auditor's misstatements concealed the risk of the failure to conduct audits in accordance with generally accepted accounting practices, not the risk of the company's bankruptcy. *See id.* Thus, the court found that "if *Lentell's* 'zone of risk' could include the risk that an accountant would make a misstatement (by conducting an improper audit), then loss causation . . . would be completely subsumed by the element of misstatement." *Id.*

the particularity requirements of Federal Rule of Civil Procedure 9(b).[102] "This

pleading constraint serves to provide a defendant with fair notice of a plaintiff's

claim, safeguard his reputation from improvident charges of wrongdoing, and

protect him against strike suits."[103] The pleadings must adequately specify the

statements that were allegedly false or misleading, provide particulars as to the

alleged falsity of the statements, state the time and place the statements were

made, and identity the persons who made them.[104] "Rule 9(b) also requires that the

detrimental reliance element of a fraud claim be pleaded with particularity."[105]

"Allegations that are conclusory or unsupported by factual assertions are

insufficient."[106]

### 1. Loss Causation

---

[102] *See Eternity Global Master Fund Ltd. v. Morgan Guaranty Trust Co. of New York*, 375 F.3d 168, 187 (2d Cir. 2004).

[103] *ATSI*, 493 F.3d at 99 (citing *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004)).

[104] *Rombach*, 355 F.3d at 170 (stating that to comply with the requirements of Rule 9(b), a plaintiff must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent") (quotation marks and citation omitted). *Accord ATSI*, 493 F.3d at 99 (citing *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)).

[105] *Gutman v. Howard Sav. Bank*, 748 F. Supp. 254, 257 (D.N.J. 1990).

[106] *ATSI*, 493 F.3d at 99.

27

As stated above, plaintiffs must plead loss causation as an element of their common law fraud claim.[107] To establish loss causation, the loss must be foreseeable and the loss must be caused by the "materialization of the concealed risk."[108] "'[A] plaintiff must allege . . . that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered,' *i.e.*, that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security. . . ."[109] Thus, the Second Circuit has made clear that in order "[t]o plead loss causation, the complaints must allege facts that support an inference that [defendants'] misstatements and omissions concealed the circumstances that bear upon the loss suffered such that plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud."[110]

---

[107] *See Catton v. Defense Tech. Sys., Inc.*, No. 05 Civ. 6594, 2006 WL 27470, at *10 (S.D.N.Y. Jan. 3, 2006) ("Because state law fraud claims require a pleading of proximate causation, the deficiency in plaintiffs' pleading of loss causation likely dooms its remaining state law claim.").

[108] *Lentell*, 396 F.3d at 173. *Accord Glidepath Holding B.V. v. Spherion Corp.*, No. 04 Civ. 9758, 2007 WL 2176072, at *16 (S.D.N.Y. July 25, 2007) ("A plaintiff has adequately pled loss causation with regard to the concealment or misstatement of a material fact if it alleges that its loss was foreseeable to the party alleged to have concealed or misrepresented the material fact and that its loss was caused by the materialization of the concealed (or misrepresented) fact.").

[109] *Lentell*, 396 F.3d at 173 (quoting *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 95 (2d Cir. 2001) (emphasis added)).

[110] *Id.* at 175.

There are several possible methods of pleading loss causation,

including "direct causation,"[111] "materialization of risk,"[112] and "corrective

disclosure."[113] "[I]n a claim based on material misrepresentations and omissions, a

plaintiff who cannot support an allegation of direct causation may do one of two

things to sufficiently allege loss causation."[114] "Where the alleged misstatement

conceals a condition or event which then occurs and causes the plaintiff's loss," a

plaintiff may plead that it is "the materialization of the undisclosed condition or

event that causes the loss."[115]

"Alternatively, a plaintiff may identify particular 'disclosing event[s]'

---

[111]    *Id.* at 174 ("If that relationship [between 'the plaintiff's investment loss and the information misstated'] is sufficiently direct, loss causation is established. . . .").

[112]    *Id.* at 173 (requiring "that the loss be caused by the materialization of the concealed risk").

[113]    *Id.* at 175 n.4 (finding that plaintiffs could not establish loss causation because they alleged no corrective disclosures).

[114]    *Catton*, 2006 WL 27470, at \*5.

[115]    *In re Initial Public Offering Sec. Litig.* ("*In re IPO*"), No. 21 MC 92, 2005 WL 1529659, at \*6 (S.D.N.Y. June 28, 2005). *Accord In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 678 (S.D.N.Y. 2007) ("In each of the cases in which the Second Circuit has employed a materialization of the risk analysis, it has considered a particular risk that was allegedly concealed by the defendant's actions and which then materialized to cause a market loss.") (citing cases).

29

that reveal the false information, and tie the dissipation of artificial price inflation

to those events."[116] There is "no requirement that corrective disclosures emanate

from the company itself, so long as the truth is disclosed in some fashion."[117]

Moreover, there is no "requirement that the disclosure take a particular form or be

of a particular quality."[118]

It is not enough, however, for plaintiffs to allege merely that they

purchased securities at artificially inflated prices. As the Supreme Court explained

in *Dura*:

> For one thing, as a matter of pure logic, at the moment the
> transaction takes place, the plaintiff has suffered no loss;
> the inflated purchase payment is offset by ownership of a
> share that *at that instant* possesses equivalent value.
> Moreover, the logical link between the inflated share
> purchase price and any later economic loss is not
> invariably strong. Shares are normally purchased with an
> eye toward a later sale. But if, say, the purchaser sells the
> shares quickly before the relevant truth begins to leak out,
> the misrepresentation will not have led to any loss. If the
> purchaser sells later after the truth makes its way into the

[116]    *Catton*, 2006 WL 27470, at *5 (quoting *In re IPO*, 2005 WL
1529659, at *6). *Accord Lentell*, 396 F.3d at 175 n.4 (noting that corrective
disclosures "reveal to the market the falsity of the prior [statements]").

[117]    *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 297 (S.D.N.Y.
2006) (citations omitted).

[118]    *In re Winstar Commc'ns*, No. 01 Civ. 3014, 01 Civ. 11522, 2006 WL
473885, at *14 (S.D.N.Y. Feb. 27, 2006).

30

marketplace, an initially inflated purchase price *might* mean a later loss. But that is far from inevitably so. When the purchaser subsequently resells such shares, even at a lower price, that lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price.[119]

## IV. DISCUSSION

### A. Plaintiffs' Common Law Fraud Claims Cannot Be Dismissed

Plaintiffs offer the following two new theories of loss causation.

*First*, they contend that the materialization of concealed risk – the alleged failure of certain events to occur on a timely basis, as previously represented by defendants – served as "constructive" disclosure to the market. *Second*, plaintiffs claim that the disclosure of the UBS PPM in July 2000 also served as a corrective disclosure. Both theories sufficiently support a finding of loss causation.

---

[119]     544 U.S. at 342-43 (emphasis in original) (holding that plaintiffs failed to plead loss causation where their only allegation was the payment of artificially inflated prices for defendant's securities and their complaint failed to "provide[] defendants with notice of what [plaintiffs'] relevant economic loss might be or of what the causal connection might be between that loss and the [alleged] misrepresentation [at issue] . . . ."). Although *Dura* involved a federal fraud claim, the discussion contained therein is also applicable to common law fraud claims because the element of causation is the same in both. *See Rich*, 2002 WL 31867724, at *13.

## 1. Constructive Corrective Notice

Plaintiffs claim that the decline in the price of Enzo stock, and their attendant losses, resulted from the materialization of the risk concealed by defendants' alleged misrepresentations and omissions. Plaintiffs allege that by the end of March to April 2000, based on defendants' misrepresentations made at the January 2000 shareholders' meeting, the market anticipated Enzo's announcements regarding the opening of additional clinics, the move from Phase I to Phase II clinical trials, and the announcement of a cure for HIV. When no announcements were forthcoming in the months immediately following the shareholders' meeting, plaintiffs allege that the market reacted and by mid-April 2000, Enzo's stock price dropped precipitously from approximately $80 per share to approximately $35 per share.[120]

Defendants point out that the alleged misstatements made at the shareholders' meeting placed the opening of the clinics at the end of fiscal year 2000 – *i.e.*, September 2000 – which was at least five months *after* the alleged materialization of the risk.[121] Nonetheless, it is reasonable to infer that defendants'

---

[120] *See* Hunt Amend. Compl. ¶¶ 106, 109.

[121] *See* Reply Memorandum in Further Support of the Enzo Defendants' Motion to Dismiss the Amended Complaints at 6. Defendants incorrectly place "the end of the fiscal year" at December 2000, stating that the clinics were not to

32

failure by April 2000 to make *any* announcement regarding the required FDA approval to open these clinics – which plaintiffs allege defendants had not even sought at the time the clinics' openings were heralded as shortly-anticipated – constituted the materialization of concealed risk that caused market loss.

Similarly, plaintiffs allege that, despite defendants' very positive statements at the January 2000 shareholders' meeting regarding the shortly anticipated shift from Phase I to Phase II clinical trials and the efficacy of the HIV treatment, no further announcements on these subjects were made in the months immediately following that meeting. Indeed, in light of the bullish nature of the representations regarding the success of the HIV treatment, plaintiffs allege that the Company's failure to announce a cure for HIV/AIDS at a convention that occurred as early as January to February 2000 had market effects.[122] By April 2000, plaintiffs allege that the complete absence of any further announcements for three full months since the shareholders' meeting constituted the materialization of risk concealed by defendants' misrepresentations and omissions, causing the sharp

---

have opened for an additional eight months after April 2000. *See id.* Defendants conflate calendar year with fiscal year, the latter of which ends at the close of September. *See* Fiscal Year definition, Reference Glossary, United States Senate, available at http://www.senate.gov/reference/glossary_term/fiscal_year.htm.

[122]    *See* Hunt. Prop. Compl. ¶ 95.

decline in the stock price.[123]

Drawing all inferences in plaintiffs' favor at this stage of the proceedings, I find that plaintiffs have adequately pled loss causation. The risk of certain significant Company events not occurring, on a timely basis or at all, was "within the zone of risk" concealed by defendants' misrepresentations and omissions, and the risk subsequently materialized and caused plaintiffs' investment loss.[124]

### 2.    The July 2000 UBS PPM

Plaintiffs' additional basis for loss causation is that the July 2000 PPM, prepared in connection with an abandoned private placement of Enzo shares, "acted as a corrective notice to a substantial segment of the institutional investment community."[125]   The lock-up letters for the UBS PPM were signed on July 25, 2000, and the UBS PPM began circulating that day.

Plaintiffs claim that the information contained in the UBS PPM countered defendants' "bullish statements and prospects"[126] made at the January

---

123    *See id.* ¶ 106.

124    *Lentell*, 396 F.3d at 173 (citation omitted).

125    *Id.* ¶ 114; *Id.* ¶ 108; *Id.* ¶ 107.

126    *Id.* ¶ 115.

34

2000 shareholders' meeting. As such, the UBS PPM is alleged to have acted as a corrective disclosure revealing the falsity of defendants' statements to a substantial segment of the institutional investment community. Plaintiffs "tie the dissipation of artificial price inflation"[127] to the corrective disclosure by alleging that during the last hour of trading on the same day the UBS PPM was circulated – July 25, 2000 – the price of Enzo stock dropped from $72 per share to approximately $57 per share. Plaintiffs claim that this drop in the price of the Company's stock during the last hour of trading was a direct result of the information set forth in the UBS PPM regarding the Company and the efficacy of its HIV therapy.

While these allegations, if true, could satisfy the loss causation pleading requirement,[128] plaintiffs have not alleged that the UBS PPM was ever publicly disseminated. Moreover, plaintiffs have failed to cite any case supporting

[127]     *Catton*, 2006 WL 27470, at *5.

[128]     *See, e.g.*, *Catton*, 2006 WL 27470, at *10 ("To establish such a link [between decline in value of Company's stock and defendants' misconduct], plaintiffs could mention the price of the Company's stock on specific dates, indicating that the stock price went up after misstatements and went down after disclosures."). *See also Winstar Commc'ns*, 2006 WL 473885, at *15-16 (holding that plaintiffs' proposed complaint established loss causation where plaintiffs alleged that the securities at issue sharply declined in price after a corrective disclosure in the form of a short-term seller's reports criticizing the issuing company's financial condition).

35

the proposition that disclosures may be corrective even when they are not public.

To the contrary, courts have routinely equated corrective disclosures with statements that have reached the public.[129] Because private placement memoranda are, by their very nature, related to private offerings[130] and are not usually available to the public, it appears to be an open question as to whether the UBS PPM can be regarded as a corrective disclosure. While there is no requirement that a corrective disclosure emanate from a particular source or take a particular

---

[129]    *See, e.g.*, *Winstar Commc'ns*, 2006 WL 473885, at \*14 ("To establish loss causation by pleading a corrective disclosure, a plaintiff must allege that when truthful word revealing the falsity of defendant's representation reached the public, the market reacted negatively causing plaintiff to suffer an injury."); *In re Enron Corp. Secs., Derivative and ERISA Litig.*, No. MDL 1446, 2005 WL 3504860, at \*16 (S.D. Tex. Dec. 22, 2005) (listing sources of corrective disclosures including "whistleblowers, analysts' questioning financial results, resignations of CFOs or auditors, announcements by the company . . . newspapers and journals, etc."); *Marsden v. Select Medical Corp.*, No. 04-4020, 2007 WL 1725204, at \*2 n. 7 (E.D. Pa. June 12, 2007) ("[T]he Court explained [in its prior opinion] Plaintiffs did not properly plead loss causation with respect to their improper revenue practices theory of liability because they failed to allege that '[Defendant] . . . publicly disclosed that it maintained improper revenue practices . . . .").

[130]    *See In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 431, 455 (S.D.N.Y. 2003) ("Although the Second Circuit has not addressed this issue, other courts in this Circuit have found that offerings made *via* private placement memoranda . . . are not public offerings.") (citing cases).

form,[131] logic dictates that the disclosure must, at the very least, be public enough to reach the market in order for the market to react negatively to the revelation of the truth underlying the alleged misrepresentations.[132]

Here, plaintiffs allege that the UBS PPM "acted as a corrective notice to a substantial segment of the institutional investment community,"[133] and have pled a spike in the volume of Enzo shares traded on the day of the disclosure, and a drop in the price of those shares during the last hour of trading on that day. Because this disclosure caused a substantial segment of the market to react (and was sufficiently public enough to have such an effect), it is fair to infer that plaintiffs have pled a causal link between the disclosure of the UBS PPM to a large number of investors and the decline in Enzo's stock price that followed quickly thereafter.[134]

---

[131]    *See, e.g., In re eSpeed*, 457 F. Supp. 2d at 297; *Winstar Commc'ns*, 2006 WL 473885, at *14.

[132]    *See Winstar Commc'ns*, 2006 WL 473885, at *14 ("One of the ways a plaintiff can plead loss causation is to allege that the market reacted negatively to a corrective disclosure regarding the falsity of the defendants' representations.") (citation omitted).

[133]    Hunt Prop. Compl.¶ 114.

[134]    The instant pleadings are distinguishable from the former pleadings in this case and the pleadings addressed by the Fourth Circuit in *Glaser v. Enzo Biochem, Inc.*, 464 F.3d 474 (4th Cir. 2006). In deciding defendants' first motion to dismiss, I found that "plaintiffs' only support for the claim that the market

## B. Reliance

Defendants also move to dismiss on the ground that plaintiffs have

not satisfied their burden to plead the element of reliance. Defendants argue that

because plaintiffs engaged in "short-term speculative trading" during the relevant

period, they cannot, as a matter of law, have relied on defendants' fraudulent

learned of defendants' misstatements [was] that: (1) Fidelity sold all of its shares by the end of 2000; and (2) an analyst who had previously predicted that Enzo's stock might right reach $111 per share later revised his estimate to $40 per share after learning that Enzo needed FDA approval before its gene therapy could be commercialized." *Hunt*, 471 F. Supp. 2d at 410 (footnote omitted). I held that neither of these allegations could be viewed as a corrective disclosure and therefore dismissed the complaint for failure to adequately plead loss causation. *See id.* The Fourth Circuit similarly affirmed the district court's dismissal of the common law fraud claim in the *Glaser* action where "plaintiffs were unable to link their losses to the alleged misrepresentations by showing that the Enzo stock price dropped upon revelation of the true state of facts." *Glaser*, 464 F.3d at 477. In doing so, the Fourth Circuit noted that "[w]hile plaintiffs repeat throughout their complaint that they were 'fraudulently induced to invest in and retain common shares of Enzo at artificially inflated prices,' . . . they make no effort to link the drop in stock price to any revelation of the true facts behind any alleged misrepresentations by defendants, let alone to one of the eight actionable alleged misrepresentations remaining after this Court's prior opinion." *Id.* In that action, it appears that plaintiffs did not allege the disclosure of any type of corrective statement which revealed the falsity of defendants' misrepresentations and negatively affected the market.

Here, in contrast, plaintiffs have alleged both constructive and actual disclosures that revealed to the market the falsity of defendants' misrepresentations, thus linking those misrepresentations to the fall in the price of Enzo stock. Accordingly, both *Glaser* and the pleadings originally filed in this action are distinguishable from the allegations made in the Proposed Amended Complaints.

statements.[135] Defendants' arguments fail.

By way of background, the Second Circuit has noted that it is an "open question" as to whether a "fraud on the market" theory can be used to satisfy the reliance requirement of a common law fraud claim under New York law.[136] While it found a split of authority among New York state courts as well as federal district courts applying New York law, the Second Circuit ultimately declined to address the issue.[137] More recently, however, courts in this Circuit have consistently held that while the "fraud on the market" theory and the rebuttable presumption of reliance is available to plaintiffs alleging claims under the federal securities laws, it is still not available to those alleging common law fraud. Rather, those plaintiffs must continue to demonstrate direct and actual

---

[135]    *See* Reply Declaration of Donald Chase ("Reply Decl."), defendants' attorney, at ¶ 10.

[136]    *Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*, 262 F.3d 134, 142 (2d Cir. 2001). In an earlier decision, the Second Circuit noted in dicta that "federal courts repeatedly have refused to apply the fraud on the market theory to state common law cases despite its wide acceptance in the federal securities fraud context." *Securities Investor Prot. Corp. v. BDO Seidman, LLP*, 222 F.3d 63, 73 (2d Cir. 2000).

[137]    *See Sumitomo Copper*, 262 F.3d at 143 ("While the uncertainty of this issue tips in favor of a grant of interlocutory review, we decline to do so because the issue is insufficiently connected to the district court's certification order.") (citation omitted).

reliance on the alleged misrepresentations.[138]

Here, even assuming that the "fraud on the market" theory is
unavailable to plaintiffs because their claims are grounded in common law fraud,
plaintiffs have adequately pled direct reliance. While defendants make much of
the fact that plaintiffs actively traded Enzo securities, plaintiffs' sophistication as
investors does not presumptively negate a finding of reliance, as defendants
contend.[139] Indeed, courts in this Circuit have held that even sophisticated
investors are entitled to the protection available under the federal securities
laws,[140] and there is no reason to believe that the same does not hold true in the
common law fraud context. While it is true that the sophistication of the investor

---

[138] *See, e.g.*, *In re Marsh & McClennan Cos., Inc.*, 501 F. Supp. 2d 452,
495 (S.D.N.Y. 2006) (noting that "[d]espite some similarities between common
law fraud and Rule 10b-5 claims, the two actions maintain meaningful
distinctions."); *Feinberg v. Katz*, No. 01 Civ. 2739, 2007 WL 4562930, at *6
(S.D.N.Y. Dec. 21, 2007) ("I will assume without deciding that, following the
greater weight of authority, New York common law fraud requires a plaintiff to
show direct reliance by the victim with respect to both misrepresentations and
omissions.").

[139] *See* Reply Decl. ¶ 10 ("Such trading activity, by its nature,
conclusively negates the reliance . . . required to state a fraud claim.").

[140] *See, e.g.*, *Quintel Corp., N.V. v. Citibank, N.A.*, 596 F. Supp. 797,
801-02 (S.D.N.Y. 1984) (citations omitted) (admitting evidence of plaintiff's
sophistication as an investor but making clear that "[s]ophisticated investors are
entitled to the protection of section 10(b) of the Securities Exchange Act of
1934").

40

is "relevant to the adequacy of disclosure and the extent of the reliance . . . on any alleged misrepresentation,"[141] this case is distinguishable from those cases where sophisticated investors' reliance was found to be unjustifiable because they "'enjoy[ed] access to critical information but fail[ed] to take advantage of that access.'"[142] Defendants do not suggest that plaintiffs had access to any "means of ascertaining the truth"[143] of the alleged misrepresentations, and it is unlikely that any individual shareholder ever had such access.

Plaintiffs have pled that they attended the January 2000 shareholders' meeting at which the alleged misrepresentations and omissions were made.[144]

---

[141]   *Id.* at 802 (citations omitted).

[142]   *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1541 (2d Cir. 1997) (quoting *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 737 (2d Cir. 1984)). *Accord Royal Am. Managers, Inc. v. IRC Holding Corp.*, 885 F.2d 1011, 1016 (2d Cir. 1989) ("Where the representation relates to matters that are not peculiarly within the other party's knowledge and both parties have available the means of ascertaining the truth, New York courts have held that the complaining party should have discovered the facts and that any reliance under such circumstances therefore would be unjustifiable.").

[143]   *Royal Am. Managers*, 885 F.2d at 1016.

[144]   *Cf. Turtur v. Rothschild Registry Intern, Inc.*, 26 F.3d 304, 307 (2d Cir. 1994) (affirming district court's grant of summary judgment in favor of defendant where "[t]he fatal flaw in the [plaintiffs'] claim, according to the district court, was that they had never actually seen, much less relied on, the supposed misrepresentations . . . ."); *In re Motel 6 Sec. Litig.*, No. 93 Civ. 2183, 93 Civ. 2866, 1997 WL 154011, at *6 (S.D.N.Y. Apr. 2, 1997) (dismissing common law fraud claim where the complaint focused "solely on an insider trading conspiracy

41

Plaintiffs further allege that they believed those statements and made investment

decisions with respect to their Enzo holdings in reliance on those statements.[145]

As a result, I find plaintiffs' allegations of actual, direct reliance to be adequately

pled, and further find that the reliance was justified and reasonable under the

circumstances.

## C. Plaintiffs Have Adequately Pled Their Holder Claims

As stated in *Hunt I*, plaintiffs' so-called "holder" claims are subject to

a heightened pleading standard that requires plaintiffs to plead specific reliance on

defendants' representations.[146] However, contrary to my earlier holding in *Hunt I*,

I now find that all of the plaintiffs' holder claims are governed by New York

_____

that perpetrated a fraud on the market" but failed to allege any facts to support the claim that plaintiffs directly relied on defendants' omissions).

[145]    Moreover, generally, call options are purchased when an investor expects shares in a particular company to appreciate. Many of Lewicki's trades, for example, involved call options on Enzo stock. Accepting the facts alleged as true and viewing them in plaintiffs' favor, Lewicki traded in Enzo call options, expecting the company's stock value to appreciate on the basis of defendants' fraudulent statements. Similarly, although Roberts engaged in several hundred transactions involving Enzo securities, it cannot be said, as a matter of law, that defendants' alleged fraudulent statements had no effect on his decision to trade in Enzo shares and his subsequent losses. Defendants' reliance arguments with respect to the other plaintiffs fail for the same reasons.

[146]    *See Hunt*, 471 F. Supp. 2d at 411-12.

law[147] and that plaintiffs have sufficiently pled all of the elements of a holder claim.

Plaintiffs have not only pled direct representations from defendants on which they relied in retaining their shares, *i.e.*, the statements made at the January 2000 shareholders' meeting and in press releases, they have also pled how many shares they would have sold and when they would have sold them. For example, Cavanagh alleges that he "had continually been assured by Defendants Gross and Weiner . . . that the Company's gene therapy was effective, which was the only reason that [he] invested in and continued to hold the Enzo shares."[148]

---

[147]    New York applies the law of the jurisdiction having the greatest interest in the subject matter of the litigation. *See Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996). "In all interest analyses, 'the significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort." *Id.* at 646 (quoting *AroChem Int'l, Inc. v. Buirkle*, 968 F.2d 266, 270 (2d Cir. 1992). "Where the parties are domiciled in different states, the locus of the tort will almost always be determinative in cases involving conduct-regulating laws." *Id.* Given the Court's previous recognition of similar heightened pleading requirements in California, Florida, and Massachusetts, this change in governing law does not alter the outcome. *See Hunt*, 471 F. Supp. 2d at 411-12 ("The Supreme Judicial Court of Massachusetts has twice held defendants liable for directly making misrepresentations to plaintiffs with the intention of inducing them to hold stock."). To determine the validity and viability of plaintiffs' holder claims according to their residence injects an unnecessary element of uncertainty into this litigation.

[148]    Hunt Prop. Compl. ¶ 146.

43

Pope and Roberts make similar allegations.[149]  In addition, plaintiffs have

sufficiently pled how many shares they would have sold and when they would

have sold them.  For example, Cavanagh alleges that "he would have sold all his

shares into the market during the month of January 2000, and, in particular, when

the stock was trading at around $100 per share."[150]  Pope makes a similar

allegation and further alleges that as to the 4,000 shares she held as of June 2,

2000, she would have sold these shares on "July 11 or July 18, 2000, when the

shares were trading at $75 per share had the truth concerning the efficacy of the

Company's gene therapy and its commercial viability been disclosed to her."[151]

For all of these reasons, defendants' motion to dismiss plaintiffs' holder claims

must be denied.

### D.    Plaintiffs' Claims Against Elazar Rabbani Must Be Dismissed

---

[149]    *Id.* ¶ 155; Roberts Prop. Compl.¶ 142.

[150]    Hunt Prop. Compl.¶ 143.  Roberts makes a similar allegation. *See*
Roberts Prop. Compl.¶ 139.

[151]    *Id.* ¶ 152.  Roberts makes a similar allegation with respect to the
25,000 shares he held as of June 2, 2000. *See* Roberts Prop. Compl.¶ 139 ("As of
the June 2, 2000 positive press release by the Company which resulted in a surge
in the price of the Company's stock, Plaintiff owned at least 25,000 shares which
were not sold until September, November and December 2000.  Had Plaintiff
Roberts known that the Company's gene therapy was not effective or
commercially viable, he would have sold his 25,000 shares on July 11, 2000 or
July 18, 2000 when the stock was trading at $75 a share.").

Plaintiffs have attempted to resurrect their claims against Elazar

Rabbani by adding two conclusory paragraphs to the Proposed Amended

Complaints.[152] The conclusory allegations contained in these paragraphs are

insufficiently particularized under Rule 9(b) because they do not identify any

specific statements made by Elazar Rabbani. Instead, plaintiffs simply allege that

Elazar Rabbani spoke at the January 2000 shareholders' meeting and "endorsed

the progress" made by Enzo including claims related to its gene therapy. Plaintiffs

do not identify the content of Rabbani's alleged communications, nor do they

specify which aspects of Enzo's gene therapy were endorsed. Without any

supporting details, plaintiffs' vague allegations fail to put Rabbani on notice of

their claims.[153]

"Where multiple defendants are involved in the alleged fraud, it is

especially important that the fraud be particularized as to each of them."[154]

Furthermore, "[o]ne of the main purposes of the rule is to apprise a defendant of

---

[152]     *See* Hunt Prop. Compl.¶¶ 23, 39; Roberts Prop. Compl.¶¶ 22, 38; Lewicki Prop. Compl.¶¶ 21, 37.

[153]     To satisfy Rule 9(b) in the Second Circuit, a plaintiff must "specify the statements that the plaintiff contends were fraudulent" and "explain why the statements were fraudulent." *Rombach*, 355 F.3d at 170 (quotation marks and citation omitted). Plaintiffs have done neither with respect to Elazar Rabbani.

[154]     *Lou v. Belzberg*, 728 F. Supp. 1010, 1022 (S.D.N.Y. 1990).

45

the claim against him and of the acts relied upon as constituting the fraud charged."[155] Therefore, absent more particularized allegations that Elazar Rabbani made false statements of fact, including specific details of the alleged misrepresentations he made, the claims against him must be dismissed under Rule 9(b).[156]

## V. CONCLUSION

The final issue to consider is whether plaintiffs should be given leave to file yet another round of amended complaints in an attempt to adequately plead a claim against Elazar Rabbani. Under Federal Rule of Civil Procedure 15(a), "leave to amend shall be freely granted when justice so requires."[157] However, the decision whether to grant leave to amend rests within the sound discretion of the district court.[158] Courts may properly deny amendment where there is evidence of "undue delay, bad faith or dilatory motive on the part of the movant, repeated

---

[155] *Felton v. Walston and Co., Inc.*, 508 F.2d 577, 581 (2d Cir. 1974) (holding that unspecified statements denominated as "deceptive" were insufficient to satisfy Rule 9(b)).

[156] Courts have strictly enforced Rule 9(b) in securities fraud cases, requiring detailed statements of the specific conduct constituting the alleged fraud. *See Farlow v. Peat, Marwick, Mitchell & Co.*, 956 F.2d 982, 986 (10th Cir. 1992).

[157] Fed. R. Civ. P. 15(a).

[158] *See Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d Cir. 1990).

46

failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc . . . ."[159]

Applying these principles to the instant case, plaintiffs are granted leave to file the Proposed Amended Complaints which were submitted in opposition to the instant motion. However, leave to file any further amended complaints is denied. Elazar Rabbani was dismissed from this case in defendants' first motion to dismiss and has been dismissed in the instant motion. He is entitled to some measure of finality. Accordingly, plaintiffs are hereby foreclosed from re-pleading their claims against Elazar Rabbani.

---

[159] *Foman v. Davis*, 371 U.S. 178, 182 (1962).

For the foregoing reasons, defendants' motion to dismiss is granted in part and denied in part. The Clerk of the Court is directed to close the following motions: Document Nos. 47 and 49 in 06 Civ. 170 (SAS); Document No. 41 in 06 Civ. 213 (SAS); and Document Nos. 2, 4, 11 and 13 in 06 Civ. 6347 (SAS). A conference is scheduled for January 25, 2008, at 4:30 p.m., in courtroom 15C.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
           January 8, 2008

## -Appearances-

**For Plaintiffs:**

Dan Brecher, Esq.
Kimberly D. Reilly, Esq.
Law Offices of Dan Brecher
99 Park Avenue, 16th Floor
New York, NY 10016
(212) 286-0747

**For the Enzo Defendants:**

Donald H. Chase, Esq.
Morrison Cohen, LLP
909 Third Avenue
New York, NY 10022
(212) 735-8600

**For Defendant Heiman Gross:**

Angelo Anthony Stio, III, Esq.
Pepper Hamilton LLP
300 Alexander Park
Princeton, NJ 08543
(609) 951-4125